## SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

## KALVEX INC., et al., Defendants.

### No. 74 Civ. 5643.

United States District Court, S. D. New York.

July 1, 1975.

William D. Moran, Regional Administrator, S.E.C., New York City, for plaintiff; Stuart Perlmutter, Douglas P. Jacobs, New York City, of counsel.

Weisman, Celler, Spett, Modlin & Wertheimer, New York City, for defendants; Gerald Gordon, New York City, of counsel.

## MEMORANDUM AND ORDER

OWEN, District Judge.

These are cross motions for summary judgment. Plaintiff Securities and Exchange Commission (hereinafter the "Commission") seeks a permanent injunction against certain alleged conduct of defendant Robert L. Ingis (hereinafter "Ingis") pursuant to Rule 56 of the Fed.R.Civ.P. Ingis seeks summary judgment in his favor to the contrary. The motion of the plaintiff is granted and that of the defendant is denied.

In this enforcement action the Commission seeks preliminary and permanent injunctions against defendants Kalvex, Inc., Emanuel L. Wolf, and Robert L. Ingis enjoining them from further violations of Sections 13(a) and 14(a) of the Securities Exchange Act of 1934. Defendants Kalvex and Wolf contemporaneous with the filing of the complaint consented, without admitting or denying the allegations of the complaint, to the entry of judgment granting the relief requested. Only defendant Ingis remains an active party.

As it pertains to him, this action involves a scheme to funnel money through a dummy corporation for the purpose of secretly receiving kickback payments from a Kalvex supplier. Defendant Ingis does not deny that he engaged in such conduct, but asserts that he acted at the behest and direction of defendant Wolf and is thus insulated from responsibility for his actions.

In addition to his participation in a kickback scheme, the S.E.C. also charges that Ingis siphoned off corporate funds from Kalvex for personal use by submitting expense vouchers and obtaining reimbursements therefor from Kalvex for expenses unrelated to any corporate purpose. At all relevant times, the defendant Ingis was a director of Kalvex[1] and was executive vice-

---

1. Kalvex is a Delaware corporation and its common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act. The common stock of Kalvex is listed and traded on the American Stock Exchange.

president and chief operational officer of Kalvex until September 10, 1974, when he was removed as an officer and employee by the board of directors. Ingis was also a director of Allied Artists Pictures Corporation ("Allied Artists") until September 12, 1974, when he was removed. Ingis was also vice-president and chief financial officer of Allied Artists until September · 25, 1974, when he was removed as an officer and employee by the board of directors of Allied Artists.

The facts are that in March or April 1973, Ingis was approached by one Stanley Halper, a friend, with the idea of starting a computer company which would provide computer services for Kalvex, Allied Artists and other companies. The principals of the computer company were to include Halper and Alfred A. Armocida.

On April 2, 1973, the computer company known as Shared Computer and Personnel, Inc. ("SCP") was incorporated in the State of Delaware and Halper, Armocida and Ingis were elected as directors. Subsequently, in July 1973, Ingis suggested to Wolf that Kalvex invest $150,000 as seed money in SCP. In consideration for this investment, Kalvex was to receive an interest-bearing convertible note of SCP (convertible into 18% of the outstanding common stock of SCP). According to Ingis, the advantages of the investment by Kalvex would be to provide Kalvex and Allied Artists with needed computer services and, at the same time, if SCP did well, provide Kalvex with an equity interest in SCP.

In July 1973, Wolf told Ingis he would approve the arrangement whereby Kalvex loaned $150,000 to SCP in return for the convertible note provided that he, Wolf, received: (1) 10% of the monthly billings received by SCP from Kalvex and Allied Artists, (2) $23,000 of the monies to be received by SCP for the original systems design for Kalvex and Allied Artists, and (3) 10% of the equity interest in SCP.

Armocida agreed to comply with Ingis' demands on behalf of Wolf, and on August 17, 1973, the Kalvex investment in SCP was consummated.

Thereafter, in March 1974, Wolf demanded that Ingis obtain a partial payment from SCP for him. Consequently, Ingis requested that Armocida tender a partial payment to Wolf, and as a result, Armocida issued an SCP check dated March 7, 1974 for the sum of $3,000. Pursuant to Ingis' instructions the payee of this check was left blank. The $3,000 check was subsequently co-signed by Ingis because all SCP checks in an amount greater than $2,500 had to be jointly signed by Armocida and either Ingis or another named officer of Kalvex. Ingis subsequently inserted the name Royalty Management Corp. ("RMC") as the payee on the $3,000 check and endorsed the check "For deposit only Royalty Management Corp." and deposited the check into an RMC bank account later on April 26, 1974. After Ingis received the $3,000 check from SCP, he met with Armocida on March 21, 1974 and asked him if he would commit to writing what he had orally promised to give Wolf in July 1973. Armocida agreed and Ingis drew up two documents which were signed by Armocida, obligating SCP to (1) pay RMC $20,000 for services rendered and (2) issue RMC 15,000 shares of its (SCP) common stock for services rendered. RMC, however, did not render any services to SCP, and was, in fact, a dummy corporation utilized by Ingis as a depository for the kickback payments from SCP.

Subsequently, on April 18, 1974, Armocida advised Ingis that he had another $3,000 for Wolf. Wolf suggested that they open an RMC bank account to deposit this and future checks received from SCP. Previously, it had been contemplated that Ingis and Halper would participate in a joint venture whereby they would invest in certain companies using RMC as the vehicle for this venture. However, this joint venture was abandoned and RMC was left a dummy corporation.

Thus, on April 18, 1974, Armocida issued a check for $3,000 on behalf of SCP which, pursuant to Ingis' instructions, was made

**314**

payable to the order of RMC. Ingis then co-signed and endorsed the check, deposited both this $3,000 check and the $3,000 check dated March 7, 1974 into the bank account he had opened in the name of RMC.

Finally, on May 7, 1974, Armocida issued another check on behalf of SCP to the order of RMC for the sum of $2,500, and Ingis co-signed, endorsed and deposited that check into the RMC bank account. Thus, within two months (March 7 to May 7, 1974), Ingis received $8,500 from SCP pursuant to the terms of the scheme.

On September 10, 1974, after being charged with the illicit activities described above, Ingis was removed as an officer and employee of Kalvex by the board of directors. Further, on September 12, 1974, Kalvex, the majority shareholder of Allied Artists preferred shares, removed Ingis as a director of Allied Artists and on September 25, 1974, after again being charged with the illicit activities described above, Ingis was removed as an officer and employee of Allied Artists by the Allied Artists Board of Directors.

 The Commission contends that defendant Ingis has both violated and aided and abetted violations of Section 14(a)[2] of the Exchange Act. They argue that as a company whose common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act, Kalvex is subject to the proxy disclosure requirements of Section 14(a), which apply to any person who solicits or permits the use of his name to solicit any proxy, and that Ingis, as a person standing for election as a director, comes within the purview of that section. I agree with that contention. Rule 14a–3 promulgated pursuant to Section 14(a), provides in pertinent part:

No solicitation subject to this regulation shall be made unless each person solicited is concurrently furnished or has previously been furnished with a written proxy statement containing the information specified in Schedule 14A.

Item 7 of Schedule 14A, 17 C.F.R. 240.14a–101, requires the disclosure of *inter alia,* (1) all direct remuneration paid by the issuer during its last fiscal year to each director or officer whose aggregate direct remuneration exceeded $40,000 during that fiscal year, (2) all remuneration payments proposed to be made in the future, directly or indirectly, by the issuer to any of its directors or officers whose aggregate direct remuneration exceeded $40,000 during the issuer's last fiscal year, and (3) all transactions since the beginning of the issuer's last fiscal year or any presently proposed transactions, to which the issuer or any of its subsidiaries was or is to be a party, and in which any of the issuer's officers or directors had or is to have a direct or indirect interest. Rule 14a–9 provides, in pertinent part that:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

 Section 14(a) of the Exchange Act was enacted by the Congress to ensure that full and fair disclosure would be made to stockholders whose proxies are being solicited so that an informed and meaningful consideration of the alternatives can be made. *Sargent v. Genesco,* 492 F.2d 750, 769 (5th Cir. 1974). Thus, where a material statement is omitted from a proxy statement, or a statement contained in a proxy statement is false and misleading in light of the circumstances in which it is made, and where there is a likelihood that such an omission or representation will influence

2. 15 U.S.C. 78n(a), and rules 14a–3 and 14a–9, 17 C.F.R. 240.14a–3 and 240.14a–9, thereunder.

stockholder votes, the broad remedial purposes of Section 14(a) have been violated. *See J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Miller v. Steinbach,* 268 F.Supp. 255 (S.D.N.Y.1967).

▮ In the instant situation there was no fight for corporate control. No tender offer or proxy contest had been initiated. The proxies solicited in the case at bar were "routine" and the only relevant substantive issues to be voted upon at the Kalvex annual meetings held on February 22, 1973 and March 4, 1974 were the election of corporate directors. However, these elections were no less important to the stockholders of Kalvex than they would have been were a proxy contest on the horizon, particularly where the undisclosed facts might have led a reasonable stockholder to question the integrity of Ingis and his ability to discharge his fiduciary obligations.

▮ The question is whether the vote of any Kalvex stockholders would have been influenced by the full disclosure of Ingis' activities, i.e., whether it would have been of material concern to a Kalvex stockholder, and whether his vote would have been influenced by the disclosure, that (1) as a result of secret dealings during July 1973, between Ingis and Armocida, president of SCP, on whose board of directors Ingis also served, Ingis had obtained a promise from Armocida that SCP would kickback to Wolf (a) 10% of the monthly billings received by SCP from Kalvex and Allied Artists, (b) $23,000 of the monies received by SCP for the original systems design for Kalvex and Allied Artists, (c) 10% of the equity interest in SCP; and (2) for the years 1971–1973 Ingis had submitted personal expenses to Kalvex for reimbursement, in the amount of approximately $1,000 per year. *Cf. J. I. Case Co. v. Borak, supra; Mills v. Electric*

*Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *General Time Corp. v. Talley Industries, Inc.,* 403 F.2d 159 (2d Cir. 1968). To ask this question is to answer it. I find that these facts were material and therefore were required to be disclosed in the proxy statements in accordance with Item 7 of Schedule 14A. I further find that these facts were concealed, in violation of Rule 14a–3. Ingis knew he was standing for election as a director; he knew that the proxy statements which had been filed and distributed were false and misleading. I believe that a stockholder would have carefully weighed his vote had these facts concerning Ingis been revealed. One does not elect as a director an individual who is using the corporation he represents for personal gain.

Thus, it is evident that Ingis violated and aided and abetted violations of Section 14(a) of the Exchange Act and Rules 14a–3 and 14a–9 thereunder, notwithstanding his contention that his participation in the kickback scheme was performed on "orders" from Wolf. Ingis' defense that he was just "following orders" does not excuse his actions. *SEC v. Pearson,* 426 F.2d 1339 (10th Cir. 1970). Although obviously it was in his self-interest to conceal, as a director and officer of Kalvex, it was his duty to disclose his participation and that of others in the kickback scheme.

The Commission further contends that Ingis aided and abetted violations of Section 13(a) of the Exchange Act and Rules 13a–1 [3] and 13a–13 [4] thereunder.

Section 13(a) of the Exchange Act provides that:

Every issuer of a security registered pursuant to section [12] of this title shall file with the Commission, in accordance with such rules and regulations as the Com-

---

**3.** Rule 13a–1, 17 C.F.R. 240.13a–1, provides: "Every issuer having securities registered pursuant to Section 12 of the [Exchange] Act shall file an annual report for each fiscal year. . . ." *This annual report is filed with the Commission on what is commonly referred to as the Form 10–K report.*

**4.** Rule 13a–13, 17 C.F.R. 240.13a–13, provides: ". . . every issuer which has securities registered pursuant to Section 12 of the [Exchange] Act and which is required to file annual reports pursuant to Section 13 of the [Exchange] Act on Form 10–K . . . shall file a quarterly report on Form 10–Q . . . for each of the first three fiscal quarters of each fiscal year of the issuer."

mission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security—

\* \* \* \* \* \*

(2) such annual reports . . . certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports . . . as the Commission may prescribe.

The purpose of requiring issuers of securities to file reports with the Commission is to insure that investors receive adequate periodic reports concerning the operation and financial condition of corporations. *In Re Penn Central Securities Litigation,* 347 F.Supp. 1327, 1340 (E.D.Pa.1972).

Clearly the requirement that an issuer file reports under Section 13(a) embodies the requirement that such reports be true and correct, and a failure to comply with such section would result in violations of the securities laws. *duPont v. Wyly,* 61 F.R.D. 615, 632 (D.Del.1973). In the instant case, Kalvex, a company whose common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and therefore subject to the above reporting requirements, filed both annual reports and quarterly reports pursuant to Section 13(a)(2) of the Exchange Act and Rules 13a–1 and 13a–13 thereunder. These reports were materially false and misleading in that the annual and quarterly reports filed with the Commission during the period December 29, 1972 to August 15, 1974 did not accurately present the accounts of the company and falsely stated the income and expenses of the company and failed to disclose that Ingis had caused the making of false entries which enabled him to receive improper reimbursements. Furthermore, the quarterly reports filed with the Commission during the period May 14, 1974 to August 15, 1974 were false and misleading and omitted to state material facts necessary to make the statements made therein not misleading in that the reports failed to disclose that RMC, a corporation under Ingis' control, had received kickbacks from

SCP in the sum of $8,500, and said reports failed to accurately present the accounts of Kalvex and falsely stated the income and expenses of Kalvex.

As a person who provided assistance and encouragement to conduct patently in violation of the securities laws, defendant Ingis must be held responsible for such conduct as an aider and abettor. *SEC v. North American Research and Development Corp.,* 424 F.2d 63 (2d Cir. 1970).

Having found that defendant Ingis has violated and aided and abetted violations of Sections 13(a) and 14(a) of the Securities Exchange Act of 1934, I must now consider whether the Commission's motion to enjoin defendant Ingis from further violations of the securities laws should be granted. Under Section 21(e) of the Exchange Act of 1934 the test laid down for injunctive relief is whether or not a "proper showing" of need has been made out by the Commission. *SEC v. First American Bank & Trust Co.,* 481 F.2d 673, 681–82 (8th Cir. 1973). This standard is quite different from the common law equity basis for an injunction since no showing of irreparable injury is required.

Accordingly, it has been determined that the "critical" question in issuing an injunction is whether "there is a reasonable likelihood that the wrong will be repeated." *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972).

Thus while the commission of past illegal conduct on the part of Ingis is highly suggestive of the likelihood of future violations, *SEC v. Culpepper,* 270 F.2d 241 (2d Cir. 1959), the inference that he is likely to repeat the wrong in the future depends upon the totality of the circumstances, *SEC v. Management Dynamics, Inc.,* 515 F.2d 801 (2d Cir. 1975) and factors suggesting that the infraction might not have been an isolated occurrence are always relevant. *See e.g. SEC v. Harwyn Industries Corp.,* 326 F.Supp. 943, 957–58 (S.D.N.Y.1971).

Defendant Ingis asserts that he is not likely to violate the securities laws in the

future. He raises five arguments in support of that assertion.

First, Ingis argues that it was he who initially apprised the Commission of the facts relating to Wolf's participation in the double-billing scheme. However, on September 30, 1974, the time when Ingis initially came to the New York Regional Office of the Commission, he had already been removed both as an officer and employee of Kalvex and as an officer and director of Allied Artists.

Second, Ingis states that he voluntarily and completely cooperated with the Commission. However, while still employed by Kalvex and Allied Artists, he never reported his illegal conduct to the Commission or any other governmental authority. As a disgruntled former employee, with nothing further to gain by remaining silent, Ingis then decided to cooperate with the Commission. This cooperation was not predicated on a sincere desire to "purge" himself, in my view, but rather to "purge" Wolf.

Third, Ingis states that it was he who reported Wolf's transgressions to the officers and directors of Kalvex, and "having properly carried out his obligations, was wrongfully removed" as an officer and director. However, Ingis, at the time he reported Wolf's duplicity said nothing of his own improper reimbursements, nor did he ever mention the existence of the kickback scheme which was allegedly carried out at Wolf's direction. Moreover, Ingis' removal as a Kalvex officer and employee was occasioned by the discovery of the kickback scheme; that upon being confronted with the documents implicating himself therein, at the Kalvex board of directors meeting on September 10, 1974, Ingis said nothing to clear himself, and, finally, at the Allied Artists board of directors meeting on September 25, 1974, when he was again confronted with the charges relating to the kickback scheme, he attempted for the first time, to tie Wolf into his actions. The issue of whether Ingis was rightfully or wrongfully removed is not before me at this time and I express no opinion thereon, but Ingis' actions prior to his dismissal are crucial to a determination of the issues herein. The facts are clear, unequivocal and undisputed that although Ingis apprised Kalvex of Wolf's duplication of expenses, he withheld information relating to the kickback scheme allegedly engineered by Wolf. *See SEC v. Golconda Mining Co.,* 291 F.Supp. 125 (S.D. N.Y.1968).

Fourth, Ingis asserts that his demand for an audit indicates that no injunction is necessary. It is doubtful however that an audit would have revealed Ingis' involvement in any kickback scheme. An audit would not even have revealed a record of the kickbacks unless SCP were also audited. Thus, Ingis was apparently safe in "demanding" an audit since the secret arrangements with SCP would not be revealed.

■ Finally, Ingis asks this Court to take into account and give credence to his assertion that he is no longer in a position, and does not intend, to engage in securities law violations in the future. I give little weight to this assertion. Ingis also continues to assert that his conduct did not violate the federal securities laws. Such an unrealistic contention creates a need for this Court to enjoin similar future conduct. *See SEC v. Manor Nursing Centers, Inc., supra,* at 1101; *SEC v. First American Bank & Trust Co.,* 481 F.2d 673, 683 (8th Cir. 1973).

Since I conclude that there is a reasonable likelihood of repetition by Ingis of his conduct here, I grant the Commission's motion for summary judgment permanently enjoining defendant Ingis from future violations of the securities laws. Defendant Ingis' cross-motion is denied.

It is so ordered.