William MALDONADO, Plaintiff,

v.

William H. FLYNN, Sam Israel, Jr., A. G. Gueymard, J. B. Harrison, Ronald C. Lassiter, B. J. Mackin, Michael R. Naess, Eugene F. Shiels, Robert B. Wall and Zapata Corporation, Defendants.

No. 77 Civil 3180.

United States District Court, S. D. New York.

March 16, 1978.

Garwin & Bronzaft, New York City, for plaintiff; Sidney L. Garwin, New York City, of Counsel.

Rogers & Wells, New York City, for defendants Flynn, Israel, Gueymard, Harrison, Lassiter, Mackin, Naess, Shiels and Wall; William R. Glendon, Guy C. Quinlan, Andrew M. Low, New York City, of counsel.

George A. Burrell, P. C., New York City, for defendant Zapata Corp.

## OPINION

EDWARD WEINFELD, District Judge.

This is a derivative action on behalf of Zapata Corporation ("Zapata" or the "Corporation") for alleged violations of various provisions of the Securities Exchange Act of 1934 [1] (the "Exchange Act") and of the common law. Jurisdiction is asserted under the Exchange Act,[2] diversity of citizenship [3] and the principle of pendent jurisdiction. The defendants are the Corporation's directors from approximately 1970 to the present; Zapata is named as a defendant for whose benefit the action is brought.

The case is now before the Court on cross-motions by the parties. Plaintiff moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on the ground there is no genuine issue of fact; the defendants move to dismiss: (a) the Exchange Act claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state claims upon which relief can be granted, and (b) the remainder of the complaint on the ground that this Court lacks both subject matter jurisdiction, and, as to the individual defendants, in personam jurisdiction. Defendants accept as true all of plaintiff's allegations for purposes of their 12(b)(6) motion, but contend that if the complaint is held sufficient, factual issues exist which preclude granting plaintiff's motion. Plaintiff's common law claims are also the subject of a suit between the parties in the Delaware state court where extensive discovery has been conducted and which, defendants assert, is "ap-proaching trial." For this reason, defendants urge that if any of plaintiff's claims survive this series of motions, proceedings herein should be stayed pending outcome of the Delaware suit.

Plaintiff's claims center about a stock option plan (the "plan") established in 1970 for key employees of Zapata and its subsidiaries, and certain modifications to that plan made by the Corporation's board of directors in July 1974 immediately prior to announcing a tender offer by the Corporation for its own shares. Under the original plan, which Zapata's shareholders approved on January 11, 1971, the price per share upon exercise of an option was $12.15, purchases could be made only for cash, and the options would be exercisable at five stages: 20%, ninety days after the date the options were granted—July 14, 1970—and an additional 20% on each of the next four successive anniversaries of the date of grant. Thus the last option exercise date was July 14, 1974. The Corporation's board of directors was authorized to make any and all changes in the plan, except those which would: (a) increase the total number of shares offered; (b) change the class of employees covered; or (c) extend the program's ten-year life. These three categories of changes had to be submitted for shareholder approval.

Toward the end of June 1974, defendant Flynn, the chief executive officer of Zapata, had considered in consultation with its bankers a tender offer in the open market for Zapata stock. By July 1 the mechanics of the offer and financing were arranged; by then all the directors were aware of the prospect of the offer and had discussed it informally with Flynn. On July 2, 1974, following the opening of the New York Stock Exchange, trading in Zapata stock was suspended upon the request of Zapata management pending a future announcement of the tender offer. When trading was halted, the price per share was approximately $18.50.

---

1. 15 U.S.C. §§ 78a *et seq.*

2. Section 27, 15 U.S.C. § 78aa.

3. 28 U.S.C. § 1332.

Later that day, July 2, a meeting of Zapata's board was held attended by Flynn, who as chief executive officer was entitled to participate in the stock option plan, and defendants Israel, Mackin, Woolcott and Gueymard, non-officers and hence ineligible under the plan. The three remaining directors at the time, defendants Harrison, Shiels and Naess, each of whom was also an officer, were not present. At the meeting, with Flynn not voting, the board unanimously modified the plan to permit: (a) non-interest bearing loans to be made to key officers in sums required to purchase stocks under the option plan; and (b) loans, also non-interest bearing, to these same employees to meet the tax liability resulting from their acquisitions under the plan. Each of these loans was to be secured by the stock to be purchased. The board also voted to accelerate the exercise date of the final 20% of the options from July 14, to July 2, 1974. Finally, although none of these modifications fell within the three categories listed above requiring shareholder approval, the board nonetheless resolved to submit these modifications (the "July 2 modifications") to the shareholders at the next regular or special meeting and a provision was contained in each loan agreement stating that if the modifications were not approved, the stock so purchased would be returned, the loans cancelled and the options reinstated. Pursuant to these resolutions, each of the officer-directors (including those not present at the board meeting) and a number of additional officers exercised their options on July 2, 1974. This constituted a purchase and sale of securities within the meaning of Section 10(b) and Rule 10b–5.[4] Thus, the stockholders of Zapata, as the seller of the securities, may bring a derivative action for any damages to the Corporation claimed to have been suffered by reason of an alleged violation of the Section and Rule.[5]

On the following day, July 3, the board formally approved the tender offer, which was announced on July 8, when trading of the stock was resumed on the Exchange. The closing price for the shares on that day was $24.50 per share. When as already noted, the officer-directors and other officers exercised their options on July 2, 1974, trading had been suspended and the market price then was $18.50 per share.

Based upon the changes in the option plan as authorized by the resolutions of July 2, 1974 and the exercise thereunder of their options by the officer-directors and others, plaintiff asserts three claims under the Exchange Act in addition to a basic common law claim for waste of corporate assets—violations of Section 10(b) and Rule 10b–5,[6] of Section ˙14(a) and Rule 14a–9 [7] and Section 7.[8] The claims will be dealt with seriatim.

## I. THE 10b–5 CLAIM

Plaintiff claims that Zapata was the victim of a 10b–5 violation perpetrated by its board of directors, when with knowledge prior to July 2, 1974 that a tender offer at a price above the prevailing market price would be made, its members voted to modify the terms of the option plan so that in end result those who exercised their options derived a tax advantage at the expense of Zapata—in essence, that the action of the board constituted a fraudulent or manipulative device or scheme to benefit the optionees to the detriment of the Corporation.

Plaintiff's position runs along these lines. Under tax law and regulations, employees exercising stock options such as those in question realize ordinary income equal to the difference between the option price and the market price at the time the option is exercised,[9] hereinafter referred to as the

---

4. Cf. *Schoenbaum v. Firstbrook*, 405 F.2d 215, 219 (2d Cir. 1968) (en banc), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

5. *E. g.*, *id.*; *Ruckle v. Roto American Corp.*, 339 F.2d 24, 27 (2d Cir. 1964); *Hooper v. Mountain States Sec. Corp.*, 282 F.2d 195, 200–03 (5th Cir. 1960), *cert. denied*, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961).

6. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5.

7. 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a–9.

8. 15 U.S.C. § 78g.

9. *See Commissioner v. Lo Bue*, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956).

"bargain spread"; [10] correspondingly, the corporation is entitled to deduct the same difference.[11] Since the options were exercised on July 2, 1974 when trading was suspended and the market price was $18.50, the difference between that market price and the option price of $12.15 per share, the bargain spread, was slightly over $6.00; the total bargain spread, which constituted ordinary taxable income to the purchasers and was tax deductible by Zapata, amounted to $1,007,000. Plaintiff's argument proceeds that by exercising their options on the accelerated date, July 2, the officers thereby avoided paying tax on an ordinary income basis on the difference between $18.50, the market price of Zapata stock on July 2, 1974, and $24.50, the market price of the stock on July 8, 1974, the date trading was resumed.[12] Thus they contend the defendants avoided paying taxes on an ordinary income basis on an aggregate of an additional $860,000 (the additional bargain spread had the option been exercised on July 8) and simultaneously prevented Zapata from realizing the benefit of a tax deduction in that amount. This difference of $860,000—or more specifically, assuming a 50% tax rate, a $430,000 net tax benefit of which it is alleged Zapata was deprived—is plaintiff's claim of damages. The argument, of course, is postulated upon an assumption that absent the July 2 modification, the defendants nonetheless would have exercised their option on July 8.

**10.** *Divine v. Commissioner*, 500 F.2d 1041, 1051 (2d Cir. 1974).

**11.** *See Divine v. Commissioner*, 500 F.2d 1041, 1050–57 (2d Cir. 1974); *Luckman v. Commissioner*, 418 F.2d 381 (7th Cir. 1969). Basically, the theory is that the Corporation loses the opportunity "to sell the optioned stock to the public at its Fair Market Value," *Divine, supra* at 1057, and instead sells it to the employee as a form of compensation alternative to cash, thus incurring an "actual expense" reducing earnings and profits. *Id.* at 1053.

**12.** Given plaintiff's contention that acceleration of the option exercise date to July 2 was part of the fraud allegedly practiced upon the Corporation, it is difficult to understand why the July 8 market price for Zapata stock is chosen to measure damages, rather than that of July 14. Indeed, had there been no modification of the plan, the final option under the plan was not exercisable until July 14, 1974.

To meet the "deception" or "manipulative conduct" requirement of the Supreme Court's decision in *Santa Fe Industries v. Green*,[13] plaintiff relies upon the fact that Zapata's shareholders were never given the information concerning the circumstances surrounding the change in the option program as authorized by the July 2 resolution. Defendants do not suggest otherwise but contend that these allegations do not constitute manipulative or deceptive conduct proscribed by Section 10 or Rule 10b–5.[14] They argue that no disclosure was required to be made to the shareholders, for Zapata's board of directors—which plaintiff admits was fully aware of the implications and consequences of the July 2 resolutions and the exercise of options—was apprised of all the material facts and based thereon authorized the sale on the Corporation's behalf. Simply stated, defendants argue that there was no deception and hence there can be no 10b–5 claim.

■ However, the corporate interest (really that of the shareholders) is not so readily disposed of. The Exchange Act "protects corporations as well as individuals who are sellers of a security." [15] and its right to protection under the Act is not foreclosed simply because the directors acted with knowledge and hence, as defendants necessarily urge, the Corporation cannot deceive itself. The courts have cut through this technical dilemma.[16] As our Court of Appeals has repeatedly stated: "In order to

**13.** 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

**14.** However, should the Court hold plaintiff's 10b–5 allegations sufficient, defendants dispute any claim of impropriety on their part. They urge that the entire plan was in the Corporation's interest and the modifications were made for valid corporate purposes.

**15.** *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971).

**16.** *See Dasho v. Susquehanna Corp.*, 461 F.2d 11, 24 (7th Cir.), *cert. denied*, 408 U.S. 925, 92 S.Ct. 2496, 33 L.Ed.2d 336 (1972); *Pappas v. Moss*, 393 F.2d 865, 869 (3d Cir. 1968); *Ruckle v. Roto American Corp.*, 339 F.2d 24, 29 (2d Cir. 1964).

establish fraud it is surely not necessary to show that the directors deceived themselves. It must be enough to show that they deceived the shareholders, the real owners of the property with which the directors were dealing."[17] Thus disclosure to the directors, even the entire board, does not necessarily foreclose a Section 10(b) and Rule 10b–5 claim in favor of the Corporation. The inquiry turns to the "degree to which the knowledge of officers and directors must be attributed to the corporation, thereby negating the element of deception."[18] The scope of the inquiry is directed to those circumstances under which, notwithstanding the knowledge of the directors attributable to the Corporation, disclosure to the shareholders is nonetheless required. Directors' knowledge is insufficient when there is a duty to disclose directly to the shareholders because "it is practical as well as just to do so."[19] Such is the case where, for example, dealings between a corporation and its parent or controlling person are questionable,[20] or where the decision is one which under state law must be made by the shareholders directly[21] or where material facts were misrepresented or withheld from some members of the board of directors.[22] But none of these situations is applicable herein.[23]

The only situation requiring disclosure directly to shareholders of even possible relevance here is the requirement that under certain circumstances disclosure be made to a corporation's shareholders when the directors have a financial interest in the transaction in question, for where the directors are so interested, it cannot be assumed that they will safeguard the corporation's interests.[24] This is not to say, however, that any transaction involving any board member must be disclosed to and approved by a corporation's shareholder under Rule 10b–5. As long as a disinterested majority of a board's directors which has authority to consummate the transaction[25]

17. *Goldberg v. Meridor*, 567 F.2d 209, 214 (2d Cir. 1977), *cert. denied*, —— U.S. ——, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978), *quoting Popkin v. Bishop*, 464 F.2d 714, 719 (2d Cir. 1972), *quoting Schoenbaum v. Firstbrook*, 405 F.2d 200, 214 (2d Cir.) (Hays, J., dissenting), *rev'd*, 405 F.2d 215 (2d Cir. 1968) (en banc), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

18. *Goldberg v. Meridor*, 567 F.2d 209, 215 (2d Cir. 1977), *cert. denied*, —— U.S. ——, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978).

19. *Id., quoting Ruckle v. Roto American Corp.*, 339 F.2d 24, 29 (2d Cir. 1964).

20. *Id.; Wright v. The Heizer Corp.*, 560 F.2d 236, 249 (7th Cir. 1977); *Bailey v. Meister Brau, Inc.*, 535 F.2d 982, 993 (7th Cir. 1976); *Dasho v. Susquehanna Corp.*, 461 F.2d 11, 26 (7th Cir.), *cert. denied*, 408 U.S. 925, 92 S.Ct. 2496, 33 L.Ed.2d 336 (1972); *Schoenbaum v. Firstbrook*, 405 F.2d 215, 219–20 (2d Cir. 1968) (en banc), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Continental Bank & Trust Co. v. Garfinkle*, 292 F.Supp. 709, 711 (S.D.N.Y.1968).

21. *Wright v. The Heizer Corp.*, 560 F.2d 236, 247 (7th Cir. 1977); *Popkin v. Bishop*, 464 F.2d 714, 720 (2d Cir. 1972); *Dasho v. Susquehanna Corp.*, 461 F.2d 11, 24 (7th Cir.), *cert. denied*, 408 U.S. 925, 92 S.Ct. 2496, 33 L.Ed.2d 336 (1972); *Goldberger v. Baker*, 442 F.Supp. 659, 663 (S.D.N.Y.1977).

22. *See, e. g., Pappas v. Moss*, 393 F.2d 865 (3d Cir. 1968).

23. Clearly this is not a situation involving transactions with a controlling shareholder, and plaintiff makes no allegation to that effect. There is no claim that the non-financially interested directors voting on the July 2 modifications were under the domination or control of, or had been misled by, any of the interested directors, all of whom did not vote on the July 2 resolutions. And although the July 2 resolutions carried a requirement, added and later removed (for some unexplained reason), that the plan modifications be submitted to the shareholders at their next meeting, that was neither a requirement of state law or of the original plan as approved by Zapata's shareholders. *See* text accompanying notes 35–38 *infra*.

24. *Dasho v. Susquehanna Corp.*, 461 F.2d 11, 24–26 (7th Cir.), *cert. denied*, 408 U.S. 925, 92 S.Ct. 2496, 33 L.Ed.2d 336 (1972); *see Pappas v. Moss*, 393 F.2d 865 (3d Cir. 1968); *Ruckle v. Roto American Corp.*, 339 F.2d 24 (2d Cir. 1964); *Goldberger v. Baker*, 442 F.Supp. 659 (S.D.N.Y.1977); *Falkenberg v. Baldwin*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 96,086 (S.D.N.Y. June 13, 1977).

25. Under § 141 of the Delaware Corporation Law, unless otherwise specified in the corporate certificate or bylaws, the majority of a corporation's board constitutes a quorum, and

is fully informed of all relevant facts, and the issue is one not otherwise reserved for stockholder resolution, disclosure to the board of directors constitutes disclosure to the corporation.[26]

■ At the time of the July 2 meeting, Zapata had eight directors—four of whom also were officers and four who were not. The former were eligible and participated in the plan, and hence were financially interested in the matters resolved at the July 2 meeting; the latter were ineligible, non-participants in the plan and thus not directly interested.[27] And it was the latter who passed—by unanimous vote—the July 2 modifications of the plan with admittedly full knowledge of the pending tender offer and the fact that purchase at the pre-offer price would have tax consequences both to the participating officers and to Zapata. Although plaintiff claims this decision constituted a breach of fiduciary duty and a waste of corporate assets, for Exchange Act purposes, disclosure was made to the Corporation via the non-interested directors. To hold otherwise would be to convert a common law or statutory action for breach of fiduciary duty into a federal securities claim and subject every salary or benefits increase or modification for a corporate officer to the scrutiny of a federal court—a result counter to both the letter and spirit of *Green.*

In *Green*, the Supreme Court was faced with a situation where there was no deception or misrepresentation—only a charge that a short-form merger between a controlling parent and its subsidiary was "unfair." The Court reversed the Second Circuit's holding that "a breach of fiduciary duty by majority stockholders, without any deception, misrepresentation, or nondisclosure, violates the statute and the Rule," [28] in part because:

The reasoning behind a holding that the complaint in this case alleged fraud under Rule 10b–5 could not be easily contained. It is difficult to imagine how a court could distinguish, for purposes of Rule 10b–5 fraud, between a majority stockholder's use of a short-form merger to eliminate the minority at an unfair price and the use of some other device, such as a long-form merger, tender offer, or liquidation, to achieve the same result; or indeed *how a court could distinguish the alleged abuses in these going private transactions from other types of fiduciary self-dealing involving transactions in securities.* The result would be to bring within the Rule a wide variety of corporate conduct traditionally left to state regulation. In addition to posing a "danger of vexatious litigation which could result from a widely expanded class of plaintiffs under Rule 10b–5," *Blue Chip*

---

the vote of a majority of those present constitutes an act of the board of directors. In this case, with an eight-person board, five people present constituted a quorum (interested persons may be counted, *id.* § 144(b)); four of those present voted in favor of the resolutions, and one, the interested director, abstained. *See* text accompanying note 27 *infra.*

**26.** *See Wright v. The Heizer Corp.*, 560 F.2d 236, 247 (7th Cir. 1977); *Dasho v. Susquehanna Corp.*, 461 F.2d 11, 24–26 (7th Cir.), *cert. denied*, 408 U.S. 925, 92 S.Ct. 2496, 33 L.Ed.2d 336 (1972); *Goldberger v. Baker*, 442 F.Supp. 659, 665 (S.D.N.Y.1977).

**27.** Plaintiff, admitting that two of the non-officer directors were not interested, argues that the other two were interested. The first was an attorney in the Texas law firm which did considerable work for Zapata and whose interest is said to lie in a desire to keep Zapata as a client. The second purchased Zapata's shares publicly (i. e., not from the Corporation) with

knowledge of the tender offer but before it had been announced and a consent judgment was entered against him in a suit brought by the SEC alleging a 10b–5 violation. It is clear, however, that neither stood to gain or lose financially by the July 2 resolutions—and are thus noninterested as that term is used herein. The fact that the former director would like his law firm to remain as counsel makes him no more interested than a director would be who is alleged to have voted a certain way to retain his seat—an insufficient allegation of interest for 10b–5 purposes. *Falkenberg v. Baldwin*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 96,086 (S.D. N.Y. June 13, 1977). And although the latter director may have committed an independent 10b–5 violation, that circumstance does not make him a director interested in the July 2, resolution for 10b–5 purposes.

**28.** 430 U.S. at 476, 97 S.Ct. at 1302.

*Stamps v. Manor Drug Stores*, 421 U.S. [723] at 740, [95 S.Ct. 1917, 1927, 44 L.Ed.2d 539], this extension of the federal securities laws would overlap and quite possibly interfere with state corporate law. Federal Courts applying a "federal fiduciary principle" under Rule 10b–5 could be expected to depart from state fiduciary standards at least to the extent necessary to ensure uniformity within the federal system. Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulations would be overridden.[29]

Moreover, the 10b–5 claim is deficient for an additional reason—there is no allegation of how plaintiff would or could have used the information had it been made available.[30] This, under *Green*, appears to be a factor relevant to a determination of the materiality of the alleged non-disclosure.[31] Finally, despite plaintiff's repetition of the phrase "insider trading" and invocation of *SEC v. Texas Gulf Sulphur Co.*,[32] neither is apposite where, as here, both parties to the transaction possess all the relevant information.[33] The purchases here were made from the Corporation; they were not made from members of the shareholding public. The 10b–5 claim cannot stand.

**29.** *Id.* at 478–79, 97 S.Ct. at 1303 (emphasis supplied) (footnote omitted). *See also Piper v. Chris-Craft Indus.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

**30.** *Compare Kerbs v. California Eastern Airways, Inc.*, 33 Del.Ch. 69, 90 A.2d 652 (1952) (corporation enjoined from effectuating stock option plan adjudged invalid because of lack of consideration); *cf.* N.Y.Bus.Corp.Law § 720 (McKinney 1963); *Rebell v. Muscat*, 26 A.D.2d 685, 272 N.Y.S.2d 478 (2d Dep't 1966) (similar remedy available under New York law).

**31.** 430 U.S. at 474 n.14, 97 S.Ct. 1292. *Compare Goldberg v. Meridor*, 567 F.2d 209, 219–20 (2d Cir. 1977) (majority opinion), *cert. denied,*

## II. THE 14a–9 CLAIM

The 1975 Zapata proxy statement, the first after the July 2 meeting and exercise of options under the plan as modified, listed the cumulative stock options purchased by various officers. It also contained a section entitled "loans to Certain Officers" which described the loans made pursuant to the July 2 resolutions as being, *inter alia*, interest free and repayable upon termination of employment and ascribed their purpose to enable the participating officers to exercise their options earlier, thereby permitting them to minimize their resulting tax liability. Plaintiff claims that the proxy statement was deficient because it failed to disclose: (a) that the options were exercised when trading was suspended and when those exercising the options had information not disclosed publicly concerning the tender offer; (b) that Zapata would be deprived of tax benefits to the extent that the officers' tax liability was minimized; and (c) that the resolutions of July 2, 1974 required shareholder approval to remain effective, absent which the shares obtained would be returned, the options restored and the loans cancelled. Moreover, plaintiff claims, the 1975 proxy statement, as well as those for 1976 and 1977, were deficient in that these items were not disclosed when directors (some of whom were also officers) sought reelection.

—— U.S. ——, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978) *with id.* at 223–24 & n.7 (Meskill, J., dissenting).

**32.** 401 F.2d 833 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

**33.** Indeed, by inference *Texas Gulf* rejects plaintiff's argument. In that case, the TGS stock options held by a number of individual defendants were granted when the optionees but not the stock options committee or the board of directors had the information relating to the oil strikes that was adjudged material. The optionees' failure to disclose to the corporation was the basis of the order rescinding the options. 401 F.2d at 857. Here, by contrast, with full disclosure on both sides, the options were exercised.

"The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." [34] Thus, to state a claim under Rule 14a–9, plaintiff must show that "the proxy solicitation itself . . . was an essential link in the accomplishment of the transaction." [35] Plaintiff claims to have supplied that link with the allegation that "the failure of defendants to include the July 2, 1974 resolutions in the April 22, 1975 proxy statement prevented the shareholders from voting down the resolutions and preventing the losses complained of."

█ Under the provisions of the plan they passed in January 1971, the July 2, 1974 modifications were entirely within the authority of the board and Zapata's shareholders could have had no expectation that the July 2 resolutions would be submitted to them as they concerned none of the areas which had been expressly reserved for their approval.[36] Moreover, as stated above, there was no requirement under state law or under a theory that the board was financially interested in the transaction so that these modifications had to be submitted for shareholder approval. The fact that Zapata's directors passed the initial resolution and then for whatever reason chose not to submit the July 2 resolutions to the shareholders does not make the 1975 proxy solicitation an "essential link in the accomplishment of the transaction." The board needed no additional authorization from the shareholders to take this action. As with the entire set of resolutions, the board's reversing itself may be a breach of fiduciary duty for which the members may be held liable under state or common law; it is not a 14a–9 violation to omit this from a proxy statement.[37]

Moreover, it is difficult to understand how, even if the July 2 resolutions had been submitted to the shareholders, they could have prevented "the losses complained of," as plaintiff contends. Plaintiff's damage claim here is the same as it was in its 10b–5 allegation—i. e., the difference in tax consequences to Zapata which would have resulted from exercise of the options at a date later than July 2. However, under the July 2 resolutions, all the shareholders could have done would have been to approve the resolutions entirely or rescind the options' exercise and restore everything to its pre-July 2 status, thereby undoing even the deduction Zapata did receive. Thus, the necessary element of "loss causation" [38] in plaintiff's 14a–9 claim, with respect to the resolutions themselves, is lacking.

█ Plaintiff in addition claims that these omissions from the 1975–77 proxy statements violated Rule 14a–9 in that at one point or another through that three-year period, each of the directors stood for reelection, and the omitted information would be material in connection with a

---

**34.** *J. I. Case Co. v. Borak,* 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964).

**35.** *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970); *see Schlick v. Penn.-Dixie Cement Corp.,* 507 F.2d 374, 381–82, 383 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Goldberger v. Baker,* 442 F.Supp. 659 (S.D.N.Y.1977); *United States v. Fields,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 96,074 (S.D.N.Y. June 3, 1977); *Lewis v. Elam,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 96,013 (S.D.N.Y. Apr. 5, 1977); *Limmer v. General Tel. & Elec. Corp.,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 96,111 (S.D.N.Y. Mar. 21, 1977); *Levy v. Johnson,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 95,899 (S.D.N.Y. Feb. 15, 1977).

**36.** The directors have not on this motion explained why, after providing for approval of the July 2 modifications by the shareholders, they were never submitted. But, as noted, this was not required under the plan, and the board's failure to do so does not give rise to a federal claim, whatever rights the shareholders may have under state law.

**37.** *Cf. Browning Debenture Holders' Comm. v. DASA Corp.,* 560 F.2d 1078, 1084 (2d Cir. 1977); *Levy v. Johnson,* [Current] Fed.Sec.L. Rep. (CCH) ¶ 95,899 (S.D.N.Y. Feb. 15, 1977).

**38.** *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 381–82 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Goldberger v. Baker,* 422 F.Supp. 659 (S.D.N.Y.1977); *Lewis v. Elam,* [Current] Fed. Sec.L.Rep. (CCH) ¶ 96,013 (S.D.N.Y. Apr. 5, 1977).

shareholder's vote. It is clear that while every allegation of a director's wrongdoing need not be included in an election proxy under penalty of a Section 14(a) claim,[39] information directly concerned with a nominee's financial relationship with the company has been held to be material and required to be included in a proxy statement for election or reelection, especially where the situation involves substantial self dealing by the nominee at the corporation's expense.[40] Thus:

> While it is not necessary that a proxy statement actually announce that a given shareholder-approved plan has been violated by the director-officers, *Walter v. Billera*, 1973 CCH Fed.Sec.L.Rep. ¶ 94,011 (S.D.N.Y.1974); *Laurenzano v. Einbender*, 264 F.Supp. 356, 361 (E.D.N.Y.1966), aff'd, 448 F.2d 1 (2d Cir. 1971), it is necessary that the stockholders be sufficiently informed concerning the manner in which executives derive their benefits so as to be able to make an informed judgment concerning the election of those executives.[41]

█ In the 1975 elections, two officers who had exercised options were candidates for reelection as directors; in 1976, but one; and in 1977, another one. The extent of their benefits under the plan, however, and the rest of their remuneration were listed in detail in the 1975 prospectus and the reasons (e. g., in part to minimize their tax liability) for the loans and resolutions were also explained. What was not disclosed, and what plaintiff claims should have been, concerns the alleged violations of fiduciary duty—whether the board of directors, informed of all relevant facts, in voting for the July 2 resolution in good faith used their business judgment in the best inter-

ests of the Corporation—and that alone is insufficient to state a claim under Rule 14a–9. Thus that claim, too, must fail.

## III. THE SECTION 7 CLAIM

As stated above, the July 2 resolutions authorized the Corporation to loan to each of the participating officers amounts equal to the purchase price of the shares upon the exercise of the options plus the tax liability thereon, and these loans were secured by the stock so obtained. However, as stated in Zapata's 1975 prospectus:

> The Company was subsequently advised by the staff of the Board of Governors of the Federal Reserve System that it could not, under the staff's interpretation of the margin regulations of that Board, make the loans to fund Federal income tax liabilities so long as the loans in the amount of the purchase price of the shares were outstanding. Accordingly, the *original notes were recently paid in full with funds obtained by the senior officers from bank borrowings. The Company subsequently made new unsecured loans to the same officers, subject to the restriction that the proceeds could not be used for the purpose of "purchasing or carrying margin securities" within the meaning of the applicable margin regulations.* The new loans are designed to achieve as many of the objectives of the prior loan arrangements as possible, within the limitations of the applicable margin regulations, by providing the funds for payment of taxes resulting from option exercises, by providing an incentive to the senior officers to contin-

---

**39.** *See Goldberger v. Baker*, 422 F.Supp. 659 (S.D.N.Y.1977); *United States v. Fields*, [Current] Fed.Sec.L.Rep. (CCH) ⸱ 96,074 (S.D.N.Y. June 3, 1977); *Lewis v. Elam*, [Current] Fed. Sec.L.Rep. (CCH) ⸱ 96,013 (Apr. 5, 1977); *Limmer v. General Tel. & Elec. Corp.*, [Current] Fed.Sec.L.Rep. (CCH) ⸱ 96,111 (S.D.N.Y. Mar. 21, 1977); *Levy v. Johnson*, [Current] Fed.Sec. L.Rep. (CCH) ⸱ 95,899 (S.D.N.Y. Feb. 15, 1977); *Markewich v. Adikes*, 422 F.Supp. 1144, 1147 (E.D.N.Y.1976).

**40.** *See Gladwin v. Medfield Corp.*, 540 F.2d 1266, 1270–71 (5th Cir. 1976); *United States v. Fields*, [Current] Fed.Sec.L.Rep. (CCH) ⸱ 96,074 (S.D.N.Y. June 3, 1977); *SEC v. Kalvex, Inc.*, 425 F.Supp. 310, 314–15 (S.D.N.Y.1975); *Markewich v. Adikes*, 422 F.Supp. 1144, 1147 (E.D. N.Y.1976).

**41.** *Goldsholl v. Shapiro*, 417 F.Supp. 1291, 1299 n.18 (S.D.N.Y.1976); *Cf. Browning Debenture Holders' Comm. v. DASA Corp.*, 560 F.2d 1078, 1084 (2d Cir. 1977).

ue in the Company's employ beyond the final maturity of their stock options, and to partially compensate such officers for the loss of the benefits of the prior arrangements. (Emphasis added.)

Based upon the fact that the initial loans were in violation of the Federal Reserve System's margin requirements (at least in the System's Board of Governors' opinion), plaintiff asserts a derivative claim on behalf of the Corporation for violation of Section 7 of the Exchange Act.

 Aside from the conceptual difficulties in implying such an action [42]—i. e., the anomaly in allowing "an action for damages in favor of the party whose activities Congress intended to confine" [43]—it would seem that any recovery by plaintiff is doubtful. Plaintiff admits that the allegedly offending loans were repaid; hence, there is no damage to the Corporation resulting therefrom. Plaintiff also alleges that the second loans were wastes of Zapata's assets and in contravention of the option plan. But as with the other federal allegations, fiduciary violations do not by themselves Exchange Act claims make.

## IV. JURISDICTION

Shorn of his substantive Exchange Act claims, plaintiff can no longer assert jurisdiction under that Act.[44] Moreover, the common law claims, having no federal claim to be pendent to, must have their own jurisdictional base or be dismissed.[45]

Plaintiff does allege that jurisdiction is also based upon diversity of citizenship. Yet he fails to allege his own state of citizenship or that of the individual defendants, except to assert that they are citizens of states other than New York. Similarly, although stating that Zapata is organized under Delaware law, he omits any mention of the Corporation's principal place of business. Nor is there anything else in the record which would assist the Court in determining whether diversity jurisdiction in fact exists. As pled, therefore, the jurisdictional allegations are insufficient and cannot support the surviving common law claims.[46]

The complaint is therefore dismissed in its entirety. Leave is given plaintiff, however, if diversity jurisdiction is claimed, to file an amended complaint with respect to the common law claims within twenty (20) days if he so desires.[47]

It is so ordered.

42. In *Gluck v. Frankel*, 440 F.Supp. 1143 (S.D.N.Y.1977), a claim was asserted under Section 7 on behalf of another plaintiff suing derivatively. After analyzing Section 7 under the criteria set by the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1974), the Court, in what it termed a case of first impression, refused to imply a claim.

43. *Gluck v. Frankel*, 440 F.Supp: 1143, 1146 (S.D.N.Y.1977).

44. *See* 15 U.S.C. § 78aa; *O'Neill v. Maytag*, 339 F.2d 764, 767 (2d Cir. 1964); *Howard v. Furst*, 238 F.2d 790 (2d Cir. 1956).

45. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Kavit v. A. L. Stamm & Co.*, 491 F.2d 1176,

1179 (2d Cir. 1974); *Molasky v. Garfinkle*, 380 F.Supp. 549, 553 (S.D.N.Y.1974).

46. *See, e. g., Guerrino v. Ohio Cas. Ins. Co.*, 423 F.2d 419 (3d Cir. 1970); *John Birch Soc. v. National Broadcasting Co.*, 377 F.2d 194 (2d Cir. 1967); *McCurdy v. Greyhound Corp.*, 346 F.2d 224 (3d Cir. 1965); *Carroll v. General Medical Co.*, 53 F.R.D. 349 (D.Neb.1971); 2A Moore's Federal Practice, ⸫ 8.10 (2d ed. 1975).

47. This disposition is without prejudice to any application defendants may make to stay such amended action pending determination of the issues in the Delaware case.