William **MALDONADO,**
**Plaintiff-Appellant,**

v.

William H. **FLYNN,** Sam Israel, Jr., A. G. **Gueymard,** J. B. **Harrison,** Ronald C. **Lassiter,** B. J. **Mackin,** Michael R. **Naess,** Eugene F. **Shiels,** Robert B. **Wall** and **Zapata Corporation, Defendants-Appellees.**

**No. 136, Docket 78–7241.**

United States Court of Appeals, Second Circuit.

Argued Nov. 9, 1978.

Decided March 15, 1979.

As Amended March 22 and April 16, 1979.

---

Sidney L. Garwin, New York City (Bertram Bronzaft, Bruce E. Gerstein, New York City, of counsel), for plaintiff-appellant.

Guy C. Quinlan, New York City (William R. Glendon, Andrew M. Low, Rogers & Wells, New York City, of counsel), for defendants-appellees William H. Flynn, Sam Israel, Jr., A. G. Gueymard, J. B. Harrison, Ronald C. Lassiter, B. J. Mackin, Michael R. Naess, Eugene F. Shiels, and Robert B. Wall.

Before KAUFMAN, Chief Judge, and MANSFIELD and MESKILL, Circuit Judges.

MANSFIELD, Circuit Judge:

In this stockholders' derivative suit on behalf of Zapata Corporation ("Zapata" or "the Corporation"), a Delaware corporation, against a group of its past and present directors, the complaint alleges that the defendants violated various provisions of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78a, *et seq.* ("the Act") and applicable "common law" in their administration of the Corporation's stock option plan for

key employees of Zapata and its subsidiaries.[1] Specifically, it is claimed that defendants (1) violated § 10(b) of the Act, 15 U.S.C. § 78j(b), and Rule 10b–5 by modifying the stock option plan without obtaining stockholders' approval, resulting in certain directors using inside information to gain substantial personal benefits at the Corporation's expense, and (2) violated § 14(a) of the Act, 15 U.S.C. § 78n(a) and Rule 14a–9 thereunder by making statements in proxy solicitations issued to the shareholders by the Corporation in 1975, 1976, and 1977, for the election of directors of the Corporation that were materially misleading with respect to the earlier modification of the stock option plan and the directors' exercise of their options thereunder.[2]

In a scholarly and thoughtful opinion Judge Weinfeld dismissed appellants' federal law allegations for failure to state claims for relief and dismissed the common law claims for lack of subject-matter jurisdiction, pendant jurisdiction having been defeated by the dismissal of the federal claims. *Maldonado v. Flynn*, 448 F.Supp. 1032 (S.D.N.Y.1978). We affirm the dismissal of the 10b–5 claim. We disagree, however, with the conclusion that the proxy statements did not contain false or misleading statements with respect to facts material to the shareholders' decision whether to vote for the defendants who sought reelection to the board of directors. Accordingly, we reverse the dismissal of the claim under § 14 and Rule 14a–9 insofar as it rests on this theory and remand the case for further proceedings consistent with this opinion.

Since the facts are set out in full in the district court's opinion, 448 F.Supp. at 1034–35, we limit ourselves here to a brief summary for convenience. Under a nonqualified stock option plan adopted by Zapata's board of directors in 1970 and by its stockholders in 1971, key employees were granted options to purchase Zapata stock at $12.15 a share. Purchases could be made only in cash, and options became exercisable in five equal installments: 20% 90 days after the date on which the options were granted, July 14, 1970, and an additional 20% on the four successive anniversaries of the date of grant. This plan authorized the board of directors to amend the plan in any way with certain exceptions not relevant here. Pursuant to the plan, options were granted to approximately 130 employees.

In late June 1974 defendant William Flynn, the chief executive officer and a director of Zapata, consulted the Corporation's investment bankers about the possibility of the Corporation's making a cash tender offer in the open market for its own stock.[3] It was decided to go forward with the offer at a price substantially in excess of the market price of the stock. It was then contemplated that Zapata would offer $25 to $30 per share for its shares, which were then trading at approximately $19 per share. By July 1, 1974, the plans for financing and executing the tender offer were complete. All of the directors had discussed the tender offer with Flynn. They were aware that it was likely to occur and that the announcement of the tender offer would trigger a sharp rise in the market price of Zapata stock.

Events came to a head on July 2, 1974. Early in the day trading in Zapata stock on

---

1. Defendants Flynn, Harrison, Lassiter, Shiels, Naess, and Wall were the "senior" officers of Zapata and recipients of options under the plan. All but Lassiter and Wall were also directors of Zapata. Israel, Mackin, Woolcott, and Gueymard were non-employee directors of Zapata and ineligible to participate in the plan.

2. Appellants also claimed below that appellees violated § 7 of the Exchange Act, 15 U.S.C. § 78g, by causing the Corporation to loan to the senior officers the purchase price of the stock bought with the options exercised in July 1974, in violation of the Federal Reserve Board's

margin requirements. The trial court dismissed this claim on the ground that the Corporation suffered no damage from the alleged violation, even if a private cause of action is inferable from § 7. Appellants do not contest this ruling, nor have they challenged the district court's dismissal of their contention that the optionees violated Rule 10b–5 by trading on inside information.

3. At all times relevant to this case, shares in Zapata were traded on the New York Stock Exchange.

the New York Stock Exchange was suspended at the request of Zapata's management, pending an announcement of the tender offer. When trading was halted, the price for Zapata stood at approximately $18.50 per share. Later that day a special meeting of the board of directors was held, with a quorum consisting of Flynn, Israel, Mackin, Woolcott, and Gueymard in attendance. The balance of the Board's eight members—Harrison, Shiels and Naess—were not present. With Flynn abstaining, the others unanimously adopted three resolutions amending the stock option plan insofar as it applied to Zapata's six "senior officers." (See footnote 1, *supra*.) One resolution accelerated the exercise date for their final installment of their options from July 14, 1974, to July 2, 1974. The other two resolutions modified the plan to authorize the Corporation to make interest-free loans to these six optionees in the amount of the purchase price for the options exercised and for the tax liability incurred by their exercising the options. Finally, the board adopted a resolution directing that these modifications be submitted to the company's shareholders for approval, with the provision that if the modifications were not approved, the stock purchased would be returned, the loans cancelled, and the options reinstated. Pursuant to these resolutions, each of the six senior officers exercised their options on July 2, 1974, purchasing in the aggregate 151,200 Zapata shares. For reasons not fully explained, the modifications were never submitted to the shareholders.[4]

On July 3, 1974, Zapata's Board met and formally authorized the tender offer at a price between $25 and $30 per share. On July 8, 1974, the Corporation publicly disclosed its intention to make a tender offer for the purchase of 2,300,000 of its shares at $25 per share, whereupon public trading in the stock resumed. The closing price for Zapata on July 8 was $24.50 per share.

The purpose and effect of the eleventh-hour amendments to the stock option plan was to permit the Corporation's six senior officers to benefit at Zapata's expense. Under applicable federal tax laws an employee who exercises stock options such as those received by the six senior officers realizes ordinary income in the amount of the difference between the fair market price of the stock at the time the option is exercised and the option price paid for the stock (the "bargain spread"). I.R.C. § 83(a), Treas.Reg. § 1.421–6(d); see *Commissioner of Internal Revenue v. LaBue*, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956). The corporation, on the other hand, is entitled to deduct the bargain spread as a business expense, it being considered a form of compensation to its employees. I.R.C. § 83(h), Treas.Reg. § 1.421–6(f); see *Divine v. Commissioner of Internal Revenue*, 500 F.2d 1041, 1050–57 (2d Cir. 1974). By accelerating the exercise date of the last installment of the options and thus allowing the six officers to exercise their options prior to the foreseen imminent rise in the market price of Zapata stock, the Board permitted the six officers to save themselves a considerable amount of tax liability, and prevented the Corporation from enjoying a correspondingly higher tax deduction, assuming the six officers would have exercised their options on or after the originally scheduled date, July 14, 1974. Given the fact that the market price immediately after the announcement of the tender offer became, as anticipated, more than double the option price, this appears to be a safe assumption.

## DISCUSSION

We first turn to appellants' contention that defendants violated Rule 10b–5 by

4. Appellees' brief states that the resolutions were not submitted for shareholder approval because the loans were repaid in full before the next shareholders' meeting was held, in April 1975. According to information supplied in the 1975 proxy statement, the senior officers obtained bank loans in March 1975 and paid off the loans made to them by Zapata in July 1974. Shortly thereafter Zapata made new interest-free loans to the senior officers in amounts slightly less than the original loans, so as to comply with the Federal Reserve Board's margin requirements, but for the same purpose of relieving the senior officers of the immediate financial burden assumed with the exercise of the stock options.

modifying Zapata's stock option plan so that they could exercise their options immediately and profit at the Corporation's expense. The Exchange Act "protects corporations as well as individuals who are sellers of a security," *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 10, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971), and Zapata's sale of stock pursuant to the stock option plan constituted a sale of securities within the meaning of § 10(b) and Rule 10b–5. See *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). However, not every allegation of malfeasance by corporate officers in connection with the sale or purchase of a security states a claim under Rule 10b–5. Since *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), an essential element is that the defendants have engaged in some form of deception.

Appellants contend that deception occurred by reason of the failure of the officers and directors to inform the shareholders of the changes in the option plan. Appellees respond that no deception occurred because, notwithstanding the direction for stockholder approval in the July 2, 1974, resolution, such approval was not required and all material facts were disclosed to the four disinterested directors, who, being a majority of the five directors who met on that date, had the power to act for the Corporation in this matter. Delaware Corp.Law § 141.

When a corporate action requires shareholders' approval, full disclosure of material information must be made to them. *Wright v. Heizer Corp.*, 560 F.2d 236, 247

(7th Cir. 1977). Where approval by the shareholders is not necessary, however, full disclosure to a disinterested board of directors is equivalent to full disclosure to the shareholders. *Goldberger v. Baker*, 442 F.Supp. 659, 663 (S.D.N.Y.1977). Even if some directors have an interest in the transaction, absent domination or control of a corporation or of its board by the officer-beneficiaries, approval of the transaction by a disinterested majority of the board possessing authority to act and fully informed of all relevant facts will suffice to bar a Rule 10b–5 claim that the corporation or its stockholders were deceived. See *Goldberg v. Meridor*, 567 F.2d 209, 214–18 (2d Cir. 1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978); *Schoenbaum v. Firstbrook*, 405 F.2d 200, 215 (2d Cir.) (Hays, J., dissenting), *rev'd*, 405 F.2d 215 (2d Cir.) (en banc), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Ruckle v. Roto American Corp.*, 339 F.2d 24, 29 (2d Cir. 1964). The knowledge of the disinterested majority must in such event be attributed to the corporation and its stockholders, precluding deception. For this purpose "disinterest" is defined as lack of any financial stake by a director in the transaction under consideration, see *Falkenberg v. Baldwin* [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,086 at 91,911 (S.D.N.Y.1977). Delaware law, although not controlling, is to the same effect. 8 Del.Code Ann. § 144.

Applying these principles here, stockholder approval of the modification of Zapata's stock option plan was not required under its charter or by-laws and was not mandated by Delaware law.[5] The four directors who

---

5. Delaware Corporation Law empowers a board of directors to establish stock option plans for officers and directors. 8 Del.Code Ann. § 157. Appellants cite two cases in support of their contention that under Delaware law a modification in a stock option plan advantageous to insiders must be approved by the shareholders when the original plan was so approved, notwithstanding § 157. *Winkelman v. General Motors Corp.*, 44 F.Supp. 960 (S.D. N.Y.1942); *Gottlieb v. Heyden Chemical Corp.*, 33 Del.Ch. 82, 90 A.2d 660, *opinion upon petition for rehearing*, 33 Del.Ch. 177, 91 A.2d 57

(1952). We find these cases inapposite. In *Winkelman* senior officers, who had maintained over a number of years an exceptionally generous bonus and stock option plan for themselves and other key employees, modified a stock option plan without approval of the board of directors, and when the modification was subsequently presented to the board for approval, failed to make full disclosure of all pertinent facts. See 44 F.Supp. at 975, 977. In *Gottlieb*, where two-thirds of the board of directors were recipients of stock options, the court did not hold that an amendment to the

approved the modification had no financial stake in the stock purchases approved by them.[6] It is true that one of them, Mackin, was a partner in a large law firm which annually received substantial fees from Zapata for legal work and that this relationship could have motivated him to curry favor with Flynn and with at least some of the other senior officers benefiting from the amendment of the stock option plan approved by him, since they would in turn be approving his firm's continued employment and its substantial legal fees.[7] However, absent a claim that Mackin voted in favor of the amendments in exchange for the Zapata management's continued retention of his firm as its counsel, or for some other *quid pro quo*, to label him an "interested" director for purposes of Rule 10b–5 because of his relationship as the company's legal counsel would be to open the door to an unworkable standard for determining whether there has been deception practiced upon the corporation. Unless and until board membership on the part of a corporation's outside counsel, or of anyone with a commercial relationship with the corporation, is outlawed, we cannot assume that a counsel-director acts for reasons that are against the corporation's interest, as distinguished from the private interests of its officers. Moreover, the shareholders were aware of Mackin's relationship as legal counsel to the Corporation when they elected him a director, and presumably were willing to trust his judgment notwithstanding this fact.

Another of the four directors who voted to amend the stock option plan, Mr. Woolcott, engaged in his own private profiteering from inside information received by him as a director regarding the impending tender offer by arranging, without the knowledge of other board members, to have a corporation wholly owned by his mother, purchase Zapata stock on the market immediately before the news of the tender offer became public.[8] Appellants contend that by thus engaging in conduct similar to that which he was called upon to judge as a director (albeit at the expense of the public rather than the Corporation) he lost his disinterestedness. As in the case of Mackin, his conduct does indicate that he may not have exercised a detached judgment on behalf of Zapata stockholders in deciding whether to approve the proposed amendments to the stock option plan. Although theoretically he could, by approving the tender offer but disapproving modification of the stock option plan, have achieved his own personal objective of using the inside information to gain a private profit at the public's expense, he may also have wanted to gain the favor of the Corporation's senior executives, with a view to protecting himself against their displeasure if they should later learn of his profiteering. In the latter

plan was invalid without shareholder approval, but only that shareholder ratification of the original plan was not prospective ratification of amendments, so that the directors would have the burden of showing the fairness of unratified amendments. See 91 A.2d at 60.

We do not think the self-imposed obligation of the directors to submit the resolutions to the shareholders affects the determination of whether the directors' knowledge should be attributed to the shareholders for purposes of Rule 10b 5. Nonattribution is justified when, because of the nature of the transaction, directors cannot be relied upon to represent the interests of shareholders fairly or when an external authority, the state, the incorporators, or the shareholders, have decreed that the directors cannot speak for the corporation. Neither of these situations is present when the directors decide for their own purposes to seek shareholder approval of a board action.

**6.** We reject appellants' contention that the non-optionee directors were "interested" because they aided and abetted the optionees in violating 10b–5. This bootstrapping theory would convert every alleged act of mismanagement in connection with the purchase or sale of a security into a 10b–5 claim, unless the act were ratified by the shareholders after full disclosure.

**7.** During the fiscal year ending September 30, 1974, Mr. Mackin's law firm received over $960,000 in legal fees from Zapata.

**8.** Mr. Woolcott's trading on inside information was evidently not known to the other directors or to Zapata's management until some time after the events giving rise to this litigation. In September 1975 Woolcott submitted to a consent judgment entered against him in a suit brought by the SEC alleging a 10b–5 violation.

even he may have believed that he could induce the management to cover up his private misuse of inside information by pointing to his cooperation in enabling them to profit at the expense of Zapata's stockholders by his approving modification of the stock option plan.

We need not reach the question of whether these circumstances would require that Woolcott be classified as an interested director since even if his vote were disregarded, a majority of the disinterested directors present would still have approved the resolutions. See Del.Corp.Law, § 144.

There remains the question of whether appellant should be afforded the opportunity to proceed on the theory that the four directors who voted in favor of the stock option plan amendments, even if they had not had any material personal interest in the matter under consideration, were nevertheless "interested" members of the board for the reason that the Corporation and its board may have been controlled by some or all of the six officers who were the beneficiaries of the amendments. Domination or control of a corporation or of its board by those benefiting from the board's action may under some circumstances preclude its directors from being disinterested. In such a case, since they would be acting as mere pawns of the controlling wrongdoer, their knowledge could hardly be imputed to the corporation or its stockholders. We have so held, for instance, where the "corporation is influenced by its controlling shareholder to engage in a transaction adverse to the corporation's interests . . . and there is a nondisclosure or misleading disclosures," *Goldberg v. Meridor*, 567 F.2d 209, 217 (2d Cir. 1977). See also *Schoenbaum v. Firstbrook*, 405 F.2d 215 (2d Cir. 1968) (en banc), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Shell v. Hensley*, 430 F.2d 819 (5th Cir. 1970). However, in the present case it is not claimed that Flynn and the five other senior Zapata officers who were the beneficiaries of the modification of the stock option plan were controlling shareholders or that they controlled decision-making by those directors who voted for the amendments (Mackin, Woolcott, Israel and Gueymard).

For all of these reasons we adhere to the rule that a director must be deemed to be disinterested for purposes of Rule 10b–5 if he has no material personal interest in the transaction or matter under consideration. Under that test, the knowledge of Mackin, Woolcott, Israel and Gueymard that their July 2 modification of the Corporation's stock option plan would benefit its six senior officers at the stockholders' expense must be attributed to the Corporation and its stockholders, thus precluding deception.

Having concluded that the four directors who voted to approve the resolutions amending the stock option plan were legally disinterested, we hold that for purposes of Rule 10b–5 the resolutions were validly adopted as corporate acts. Under § 141 of the Delaware Corporation Law, unless otherwise provided in the corporate charter or by-laws (which was not the case here), the majority of a corporation's board constitutes a quorum (interested directors being counted for this purpose), and a vote of a majority of those present constitutes an act of the board of directors. Zapata had an eight-member board, five of whom were present at the July 2 meeting, and four disinterested directors voted in favor of the resolutions. Since the amendments were thus validly enacted by a vote of disinterested board members who had been fully informed of all material facts, their knowledge was attributable to the Corporation and no "deception" occurred within the meaning of Rule 10b–5.

Turning to appellant's claim that the defendants violated § 14(a) of the Exchange Act and Rule 14a–9 promulgated thereunder by failing to disclose in the 1975 proxy statement that the amendments of the stock option plan required shareholder approval, we agree with the district court that this theory must be rejected since shareholder approval was unnecessary. Moreover, the 1975 proxy statement played no part in rendering the amendments legally effective. Even if stockholder approval of

the amendments had been required, we doubt that failure to seek such approval would have given rise to a claim under § 14(a), since its purpose, as the Supreme Court pointed out in the seminal case of *J. I. Case v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964), "is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." See also *Mills v. Electric Auto-Lite*, 396 U.S. 375, 381, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970) (§ 14(a) "was intended to promote 'the free exercise of the voting rights of stockholders' by ensuring that proxies would be solicited with 'explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.'" (quoting from H.R.Rep.No. 1383, 73d Cong., 2d Sess. 14; S.Rep.No. 792, 73d Cong., 2d Sess. 12)). The prevailing definition of a "material fact" under Rule 14a–9 presupposes that the rule applies only when shareholders are asked to vote. See *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Since Zapata's management did not ask shareholders to approve the modification of the stock option plan, § 14(a) is inapplicable.

■ Appellant's claim that the proxy statements used to solicit votes for the election of Zapata directors in 1975, 1976 and 1977 were false and misleading in violation of § 14(a) and Rule 14a–9 thereunder, because of their non-disclosure of the true circumstances surrounding the 1974 amendments to the stock option plan, stands on an entirely different footing. This claim does not present merely another attempt to use § 14(a) and Rule 14a–9 as an avenue for access to the federal courts in order to redress alleged mismanagement or breach of fiduciary duty on the part of corporate executives. Efforts to dress up claims of the latter type in a § 14(a) suit of clothes have consistently been rejected, including allegations of failure to. disclose a disputed

legal theory regarding the legality of transactions approved by the board, see *Ash v. LFE Corp.*, 525 F.2d 215, 220 (3d Cir. 1975); *Goldberger v. Baker*, 442 F.Supp. 659, 667 (S.D.N.Y.1977), failure to disclose an alleged ulterior motive for a fully described corporate action, see *Gollub v. PPD Corp.*, 435 F.Supp. 564, 567–68 (E.D.Mo.1977), or failure to disclose lack of skill or judgment in approving a transaction intended for the corporation's benefit, see *Levy v. Johnson* [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,899 (S.D.N.Y.1977) (illegal foreign payments); *Limmer v. GTE* [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,111 (S.D.N.Y.1977) (same). Here, in contrast, the alleged misleading statements and non-disclosures involve matters of direct and deep concern to shareholders in the exercise of their right to vote, which the Exchange Act expects to be fully disclosed in proxy solicitations for election of officers and directors. Indeed, the compensation of directors and key officers and transactions between them and their corporation are matters explicitly covered by SEC disclosure regulations. See Schedule 14A, Items, 7, 9–11, 17 C.F.R. § 240.14a–101.[9] Since self-dealing presents opportunities for abuse of a corporate position of trust, the circumstances surrounding corporate transactions in which directors have a personal interest are directly relevant to a determination of whether they are qualified to exercise stewardship of the company. *Goldsholl v. Shapiro*, 417 F.Supp. 1291, 1298–99 (S.D.N.Y.1976). For this reason Rule 14a–9 specifically sets out minimum standards for disclosure and, going beyond the Rule, it has been recognized that shareholders are entitled to truthful presentation of factual information "impugning the honesty, loyalty or competency of directors" in their. dealings with the corporation to which they owe a fiduciary duty. See *Cohen v. Ayers*, 449 F.Supp. 298, 317 (N.D.Ill.1978); *Berkman v. Rust Craft Greeting Cards,*

---

9. Schedule 14A sets minimum disclosure standards. Compliance with this schedule does not necessarily guarantee that a proxy statement satisfies Rule 14a -9. *Cohen v. Ayers*, 449

F.Supp. 298, 317 (N.D.Ill.1978); *Lyman v. Standard Brands Inc.*, 364 F.Supp. 794, 796 (E.D.Pa. 1973).

*Inc.*, 454 F.Supp. 787 (S.D.N.Y.1978); *SEC v. Kalvex, Inc.*, 425 F.Supp. 310 (S.D.N.Y. 1975); *Rafal v. Geneen* [1972–73] Fed.Sec.L. Rep. (CCH) ¶ 93,505 (E.D.Pa.1972); *Robinson v. Penn Central Co.*, 336 F.Supp. 655 (E.D.Pa.1971).

In recognition of the relevancy and materiality of information of the foregoing nature, Zapata's 1975 proxy statement, which was the first such statement issued for election of directors after the amendment to the stock option plan,[10] contained a table showing the number and monetary value of the stock options granted to or exercised by officers Flynn, Naess, Shiels, Harrison,[11] and by all directors and officers as a group for the period from October 1, 1973 to March 26, 1975.[12] The statement also discussed the loans made by Zapata to the officers to cover the cost of purchasing the stock and their resulting tax liability. However, the statement significantly failed to advise the stockholders that on July 2, 1974, members of the board, possessed of inside information to the effect that an imminent tender offer would sharply increase the market value of Zapata's shares, had amended the plan by accelerating the option exercise date, thus enabling Zapata's six senior officers to enlarge their profit substantially and reducing by several hundred thousand dollars the benefit which Zapata would otherwise have derived from the exercise of the options under the plan as it stood before amendment. In addition, the statement did not point out that under the original terms of the stock option plan Zapata shares could be purchased by the officers only for cash, so that amendment of the plan was necessary to obtain authorization for the loans. The statement also neglected to mention that the board had directed that the resolution be submitted for shareholders' approval, which had neither been sought nor obtained.

What the 1975 proxy statement did represent was that

> The purpose of the . . . loan arrangements was to enable [the] officers to exercise their options at a time when, because of the generally depressed state of the securities markets, the differential between the market value of the Common Stock and the exercise price of their options, and therefore the Federal income tax liability resulting from exercise, would be minimized.

At best this statement was a half-truth and quite misleading. It was true that the loans were made and the options exercised in order to minimize the optionees' resulting tax liability. What was not true was the implication that prompt exercise of the options had been encouraged merely to anticipate a turnaround in a generally depressed state of a market that would reduce the attractiveness of the options.

---

10. Directors of Zapata are elected to three-year terms. The terms of those elected in 1975 have expired, rendering moot the question of the validity of that election, see *Browning Debenture Holders Committee v. Dasa Corp.*, 524 F.2d 811, 814 17 (2d Cir. 1975); *Cohen v. Ayers*, 449 F.Supp. 298, 321 (N.D.Ill.1975). However, the 1975 proxy statement remains relevant to the determination of whether adequate disclosure was made in 1976 or 1977, since the proxy statements for those years did not add to or revise any of the statements made in 1975 and the directors elected to three-year terms in response to those statements still hold office pursuant to the elections in the latter two years.

11. Naess and Shiels were reelected to the board in 1975, as was Woolcott, who subsequently resigned. Lassiter, Gueymard and Mackin were reelected in 1976, and Flynn and Israel were reelected in 1977.

12. It is possible that this chart was in violation of the disclosure requirements of Item 7(d) of Schedule 14A, 17 C.F.R. § 240.14a--101. Item 7(d) requires disclosure in a proxy statement of the number of options "granted" to each director or officer who received over $40,000 in direct remuneration during the last fiscal year and to all directors and officers as a group. Item 7(d)(1). The table states that no options were granted to such persons during the period covered. Instruction 2 for Item 7(d) provides that the "material amendment of options shall be deemed the granting of options within the meaning of this paragraph." Under the circumstances, the advancement of the exercise date and the removal of the requirement that purchases be made in cash materially amended the option plan. Thus, the proxy statement should have indicated the number of options affected by the amendment as having been "granted" during the preceding fiscal year.

The reason for the loans was to enable the officers to exercise their options to purchase Zapata shares for $12.15 per share at a time when they could realize additional profit at Zapata's expense. The officers knew from their inside information regarding the tender offer, which they then expected to be $25 to $30 per share, that there would in a few days be a sharp increase in the market price of Zapata shares, then selling around $18.50 per share. Indeed, the resulting increase in market price of the stock (from $18.50 to $24.50 per share) proved to be so large that the officers undoubtedly would have been quite willing to exercise their options later (on July 14th) at $12.15 per share and borrow the amount needed to pay income taxes on the increased bargain spread (i. e., the difference between $12.15 and $24.50 per share). The proxy statement, however, left the misleading impression that the authorization of the loans was a routine corporate action undertaken to serve the interests of the Corporation, whereas in fact the authorization facilitated transactions costing it more than $400,000 in tax savings.

We believe that a reasonable shareholder of Zapata Corporation could have considered it important, in deciding how to vote his proxy in 1976 and 1977, to know that the candidates for directorships had voted for, and in some cases benefited substantially from, the resolutions modifying the exercise date and removing the requirement of payment in cash so as to enable certain senior officers to avoid the adverse personal tax effect of the impending tender offer, known to them through inside information, while depriving the Corporation of a corresponding tax benefit.[13]  Accordingly, we remand this case to the district court for

further proceedings consistent herewith, including a determination of whether the election of Zapata's directors should be nullified and whether the court should entertain jurisdiction over the pendent common law claims.[14]

---

13. Our decision is not intended to preclude appellees from introducing evidence rebutting the prima facie showing that a reasonable shareholder of Zapata would have considered it important to know these facts omitted from the proxy solicitations.

14. When this case was argued on appeal, appellant's state court action against appellees for state claims arising out of the modification of stock option plan was evidently about to go

to trial. Having in mind that the power of federal courts to hear state claims "need not be exercised in every case in which it is found to exist," *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), we leave it to the district court upon remand to determine in its discretion on the basis of more current information whether the common law claims should be left for resolution by the state court.