**UNITED CANSO OIL & GAS LIMITED, et al.**

v.

**The CATAWBA CORPORATION, et al.**

Civ. No. H–77–301.

United States District Court,
D. Connecticut.

June 17, 1983.

James O'Connor Shea, New Haven, Conn., Sidney B. Silverman, and Joan T. Harnes, Silverman & Harnes, New York City, Albert Zakarian, Hugh E. Hegyi, and Sharon Tisher, Day, Berry & Howard, Hartford, Conn., for plaintiffs.

Steven M. Umin, Williams & Connolly, David N. Webster, Nussbaum, Owen & Webster, Irving R.M. Panzer, Washington, D.C., William R. Moller, and Wesley Hor-

ton, Moller, Horton & Fineberg, Francis J. Farrelly, O'Connor, Farrelly & DeCorleto, Hartford, Conn., for defendants.

### RULING ON DEFENDANTS' MOTION TO DISMISS

BLUMENFELD, Senior District Judge.

This action was originally brought as a derivative suit by shareholders of United Canso Oil & Gas Limited (United Canso) against the corporation, several of its directors, and The Catawba Corporation (Catawba) on June 23, 1977. United Canso is a Nova Scotia corporation engaged in oil and gas exploration and development with its principal offices in Calgary, Alberta, Canada. Catawba is a Delaware corporation with its principal place of business in Connecticut. The named individual defendants, the "Buckley Group," controlled United Canso until the summer of 1980 when an independent slate of directors was elected. These individuals were also allegedly in control of Catawba. After the takeover by the independent board, United Canso was realigned as plaintiff and filed its Second Amended Complaint with leave of the court on January 13, 1981. Subsequent to the SEC filing a complaint and consent decree in an investigation involving Catawba and a number of the individual defendants in this action, a Third Amended Complaint was filed with leave of the court on May 10, 1982.

The original and second amended complaints stated claims for breach of fiduciary duty arising out of several transactions through which the defendants allegedly milked United Canso of money in order to benefit corporations controlled by the "Buckley Group." The Third Amended Complaint added new claims alleging breaches of fiduciary duty in connection with additional transactions and detailed federal securities law claims arising out of both sets of transactions. In the motion now before the court the defendants seek an order: (1) dismissing the federal securities law claims for failure to state a claim

upon which relief can be granted; (2) dismissing the fiduciary duty claim as to one transaction, the "Borealis Venture," for failure to state a claim upon which relief can be granted under state law; (3) dismissing all counts in the Third Amended Complaint referring to common-law fraud for failure to state a claim, or alternatively striking such references for failure to state with particularity the circumstances constituting fraud; and (4) dismissing the individual plaintiffs for lack of standing.

### I. The Structure of the Third Amended Complaint

The Third Amended Complaint is 42 pages long, containing seven counts in 105 paragraphs and a prayer for relief.[1] The First Count is designated by the plaintiffs: "The Management Agreements." Between 1954 and 1974, Catawba and United Canso entered into a series of five-year agreements (referred to by plaintiffs as "Management Agreements"). These agreements obligated United Canso to pay Catawba hourly compensation in return for "technical assistance and administrative services." In addition, United Canso was obliged to assign to Catawba a $\frac{1}{64}$th gross overriding royalty in oil, gas or minerals produced on lands covered by leases or other interests acquired by United Canso during the period of the Management Agreements. The plaintiffs allege that United Canso has paid substantial sums to Catawba under this royalty provision and that Catawba still claims that United Canso is obligated to make such payments on interests acquired while the agreements were in effect.

Plaintiffs allege that the services purportedly provided by Catawba to United Canso were not necessary, were inadequately performed by Catawba, or in some cases were not performed at all. In addition, the defendant directors who had an interest in the agreements by reason of their affiliation with Catawba did not make adequate disclosure of this interest as required by Chapter 32 of the Canada Corporations Act,

---

1. Each count incorporates all of the paragraphs of the preceding counts. This practice, while confusing, does not present a serious problem with the exception of the Seventh Count.

Section 98(1). Consequently, the Management Agreements were a "fraud and deceit" upon United Canso, and, in approving them, the defendant directors breached their fiduciary duties to the shareholders of United Canso and their contractual duties of trust, loyalty and fair dealing to United Canso. The defendant directors who were not themselves shareholders, officers or directors of Catawba are alleged to have acted in a conspiracy with those who were, and all of them are alleged to have concealed the existence of this conspiracy until July of 1980.

The Second Count is labeled: "The North and Celtic Sea Transaction." In 1971 United Canso incorporated a wholly-owned British subsidiary, United Canso Oil & Gas Limited (U.K.) ("United Canso U.K."). This company acquired percentage working interests in licenses to explore for oil and gas on designated blocks in the North and Celtic Sea. Exploration activities determined that the North Sea block contained oil and gas, but substantial expenses had to be incurred to develop it. United Canso, owner of a 20% working interest, was obligated to bear 16% of this expense, or between $120 and $160 million. The company, having difficulty in meeting this commitment and facing forfeiture of its interest, arranged to sell all of its stock in United Canso U.K. to a German company Deutsche Erdolversorgungsgesellschaft-M.b.H.-Deminex (Deminex). The deal was closed in March 1975 with Deminex paying a large cash price for all the stock of United Canso U.K. At this point, the defendants allegedly conspired together on a plan to defraud United Canso and its shareholders. The individual defendants who were both directors of United Canso and stockholders of Catawba allegedly agreed to assert that Catawba was entitled, under the 1969 Management Agreement, to a 1/64th royalty of the oil and gas produced on the North and Celtic Sea blocks attributable to United Canso U.K.'s interests. The defendants allegedly also agreed to assert that the Man-

agement Agreement was breached by United Canso because it sold the shares of United Canso U.K. without making provision for Catawba's 1/64th royalty interest.

In May of 1975 defendants Taylor and Barton recommended a proposed settlement offer to the Board of Directors of United Canso. In June of 1975 a settlement agreement was entered into by United Canso, Catawba and certain trustees and beneficiaries. In return for payment of $3,196,000 (Canadian) Catawba and its shareholders would release United Canso from all royalty claims with respect to the sale of United Canso U.K. Plaintiffs allege that this amount provided for unnecessary, unreasonable and grossly excessive compensation to defendant Catawba. In approving the payment the defendant directors of United Canso and Catawba breached their fiduciary duties to the shareholders of United Canso and their contractual duties to United Canso.

The Third Count is labeled: "Payment of Legal Fees." This count is not involved directly or indirectly in the outstanding motion to dismiss.

The Fourth Count is labeled: "Transactions Involving Pancoastal and Minex." In the 1960's and early 1970's, Catawba purportedly entered into an arrangement with a Delaware corporation named Pancoastal, Inc. (Pancoastal) similar to the one that it had with United Canso. Defendants John Buckley and C. Dean Reasoner were directors of Pancoastal. Plaintiffs state that by 1975 Pancoastal owed approximately $1.4 million to Catawba for alleged services and loans.[2] The loan notes were held by Buckley family members as well as by Catawba and were secured by Pancoastal's 17.7% equity interest in Pantepec International, Inc. (Pantepec), another Delaware oil and gas exploration and development corporation. Plaintiffs allege that United Canso, acting under the defendants' control, made two large post-1975 investments for the

---

**2.** On October 16, 1980, Pancoastal filed a petition under Chapter 7 of the Federal Bankruptcy

laws.

purpose of helping Pancoastal repay its debt to Catawba.

The first investment involved the purchase of shares in a company called Minex. Minex was originally designed to be the product of a merger between Pancoastal (after the liquidation of its debt to Catawba) and Valmex Petroleum Corporation (Valmex) a mineral exploration company with contingent interests in Africa and the Mideast. By June of 1975 defendants Reasoner, Heath and John Buckley allegedly learned that Valmex was reluctant to complete a proposed merger with Pancoastal because of Pancoastal's large debt. Buckley and Reasoner then proposed that United Canso contribute the needed cash toward a venture with Valmex and Pancoastal. The approximately $2 million furnished by United Canso would buy a substantial equity interest in Minex, Pancoastal and Valmex shareholders would receive shares in Minex in return for their stock in the old companies, and Catawba and the Buckley family members would receive equity in Minex in return for the cancellation of the debts owed to them. However, the agreement to accept Minex shares in return for the liquidation of the debt was never implemented, and the merger of Pancoastal into Minex was never accomplished. In 1977 and 1978, Minex paid Catawba approximately $80,000 in fees for services rendered by Catawba.

The second investment involved the purchase by United Canso of Pancoastal's Pantepec stock with the understanding that Pancoastal would then retire its secured debt and follow through with the merger into Minex. Defendant Reasoner, who was also a Pancoastal director, recommended that United Canso grant Pancoastal a one-year option to repurchase the shares. The board approved the purchase at market price and the granting of the option. After the purchase in 1979, Pancoastal distributed nearly all of the approximately $1 million in proceeds to its secured creditors, principally the defendants in this case.

Plaintiffs allege that by devising and effecting these two transactions, the defendants breached their fiduciary and contractual duties. In 1980 the new management of United Canso sold its interest in Minex to a third party for an amount equal to approximately ⅛th of United Canso's total investment to that date. While United Canso still possesses the Pantepec shares, in 1980 it was forced to pay Pancoastal $500,000 in settlement of Pancoastal's claim to the option.

The Fifth Count is labeled: "The Borealis Venture." In 1968 United Canso and Canada Southern, another Nova Scotia corporation controlled by Catawba, were induced by the defendants to invest heavily in Borealis Exploration, Ltd. (Borealis), a Canadian company with interest in mining properties in the Northwest Territories. Pursuant to a plan devised by the defendants, the boards of United Canso and Canada Southern agreed to purchase $450,000 in debentures, interest-free for five years, from Borealis and keep that company's books and records for four years without charge. In return each company received approximately 8.4% of the total outstanding shares in Borealis. Catawba received a majority interest in Borealis in return for the alleged sale of mining permits and expenses incurred by Catawba on those permits prior to the sale.[3] Borealis also became a Catawba client, paying it fees and a ⅟48 gross royalty interest on its properties.

In the next few years, United Canso continued to pay money to Borealis in return for a direct interest in Borealis mining claims. In 1978 Borealis defaulted on the debentures it owed United Canso and Canada Southern totaling approximately $648,000. In March of 1979, the two companies forgave this debt and relinquished their shares and direct interests in the Borealis claims in return for approximately 9% of the net profits of future Borealis production. This transaction took place under the plan and direction of the defendants.

---

**3.** According to ¶ 86 of the Third Amended Complaint, a committee of non-Catawba-related Borealis directors determined in 1979 that the issuance of these shares to Catawba was highly questionable.

According to the plaintiffs' figures, United Canso has invested to date approximately $384,100 (Canadian) in Borealis without receiving any income or benefits. Plaintiffs allege that by planning and approving the investments in Borealis the defendants breached their fiduciary and contractual duties and that the individual defendants failed to meet the standard of care required of directors and officers. The defendant directors who were connected with Catawba are said to have unjustly enriched themselves and Catawba at the expense of United Canso and usurped corporate opportunities. The other defendant directors are alleged to have aided and abetted these actions.

The Sixth Count begins what defendants term the "false federalization" of plaintiffs' allegations of corporate mismanagement. The Sixth Count is labeled: "Proxy Violations." In it plaintiffs purport to state a claim under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and Rule 14a–9 of the Securities and Exchange Commission. Plaintiffs claim that the proxy statements disseminated in connection with the annual election of United Canso's Board of Directors from 1954–1980 were materially false or misleading in that they concealed from stockholders the extent to which the defendants dominated United Canso, including the various misdeeds allegedly performed by them. The complaint clearly details how the proxy statements are alleged to have been materially inaccurate and incomplete.

The Seventh Count is labeled: "Section 10b Violation." In part it alleges that:

In connection with the devising, approval and effecting of (a) the 1975 sale of stock of United Canso U.K. and the Royalty Settlement; (b) the 1979 purchase of Pancoastal's Pantepec shares with the buy-back option; (c) the 1975–1980 investments in Minex securities; and (d) the 1968–1980 investments in Borealis securities, the defendants ... have engaged in acts, practices, and a course of business which constitute violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder. Third Amended Complaint, ¶ 105.

The Sixth Count provided extensive detail on the alleged failure to disclose material facts relating to these transactions. The Seventh Count appears to rely on these details of nondisclosures in proxy statements to describe the alleged Rule 10b–5 violations in connection with United Canso's purchase (Pancoastal, Minex, and Borealis transactions) or sale (North and Celtic Sea transaction) of stock. It alleges that the defendant directors of United Canso who were also shareholders, officers or directors of Catawba, or other parties to these transactions, had conflicts of interest that they resolved adversely to United Canso, thereby defrauding United Canso and enriching themselves and Catawba. The other defendant directors are alleged to have aided and abetted this fraud. Finally, the Seventh Count states that "United Canso, being dominated and controlled by the defendants, and its shareholders being misinformed as to the actual nature and circumstances surrounding said sale and purchases, was rendered powerless to protect itself from the devices and plans of the defendants."

Throughout the complaint the plaintiffs have scattered allegations that the defendants' conduct constituted some type of fraud. The following are examples of this practice: "The actions of the defendants ... constituted a continuing fraud, tort and conspiracy against the shareholders of United Canso and against the corporation itself." Count 1, ¶ 35; "Defendants, conspiring each with the other, determined upon a further plan and scheme to defraud United Canso and its shareholders." "The total payment to Catawba of $3,196,000 under the Settlement Agreement operated as a fraud and deceit upon United Canso ...." Count 2, ¶¶ 40, 46; "The actions of the defendants as described above ... constituted a continuing fraud, tort and conspiracy against the shareholders of United Canso and against the corporation itself." Count 4, ¶ 78; "The actions of the defend-

ants as described ... constituted a continuing fraud, tort and conspiracy against the shareholders of United Canso and against the corporation itself." Count 5, ¶ 90.

## II. *The Motion to Dismiss the Federal Securities Law Claims*

### A. *The Sixth Count—Proxy Violations*

■ The defendants challenge the Sixth Count on the ground that the allegedly defective proxy solicitations were not an "essential link" in the accomplishment of the challenged transactions as required by case law. *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 384–85, 90 S.Ct. 616, 621–622, 24 L.Ed.2d 593 (1970). This requirement has been termed "transaction causation" in this circuit. *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

A private right of action for violations of section 14 was first recognized by the Supreme Court in 1964 in *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). That section makes it "unlawful" to solicit proxies in contravention of the rules of the Securities and Exchange Commission. Rule 14a–9 prohibits solicitations "containing any statement which ... is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." In the *Mills* case, as noted above, the Court further defined the elements of a cause of action, in particular the causation question.

> Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress *if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.*

396 U.S. at 385, 90 S.Ct. at 622 (emphasis added).

In this case plaintiffs specifically charge that the alleged improprieties in the contractual relationship between United Canso and Catawba, *e.g.* fraudulent or exorbitant bills for services, as well as the corporate transactions challenged in earlier counts as breaches of fiduciary duty, *e.g.* the royalty settlement in connection with the United Canso U.K. sale, were not disclosed in the proxy statements issued in connection with the election of directors between 1954 and 1980. It is quickly apparent that none of these transactions were in themselves the subject of shareholder approval, rather the only shareholder involvement was in the election of the directors who carried out the transactions.

Plaintiffs have not been able to cite one case in which transaction causation was found between defects in proxy statements made in connection with the election of corporate directors and transactions conducted by the board subsequent to their election. As plaintiffs point out, two recent Second Circuit cases, *Weisberg v. Coastal States Corp.,* 609 F.2d 650 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980) and *Maldonado v. Flynn,* 597 F.2d 789 (2d Cir.1979), involved section 14(a) claims directed at proxy statements made in connection with the election of directors that were upheld despite motions to dismiss. However, in each of these cases the plaintiff was seeking equitable relief, *i.e.* the setting aside of the challenged election and a new election.[4] In *Maldonado,* Judge Mansfield pointed out that:

> Efforts to dress up claims of [mismanagement or breach of fiduciary duty on the part of corporate executives] in a § 14(a) suit of clothes have consistently been rejected, including allegations of ... failure to disclose lack of skill or judgment in approving a transaction intended for the corporation's benefit, see *Levy v. Johnson* [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,899 (S.D.N.Y.1977) (illegal for-

---

4. The election of a completely new board in 1980 relieved plaintiffs in this case from the burden of seeking such relief.

eign payments); *Limmer v. GTE* [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,111 (S.D.N.Y.1977) (same).

597 F.2d at 796. Both *Levy* and *Limmer* involved plaintiffs seeking damages for improper conduct of corporate directors because of allegedly defective proxy statements issued in connection with the election of those directors and not equitable relief affecting the election. The contrast between these cases and *Maldonado* and *Weisberg* is apparent.

Even though they also seek damages for subsequent misdeeds instead of injunctive relief in connection with the challenged elections, plaintiffs seek to distinguish their claim because it involves the concealment of improprieties on a much greater scale than those present in *Levy* and *Limmer*. They claim that defendants were involved in a "scheme" lasting 26 years in which they dominated and abused United Canso. Plaintiffs' theory rests on a conception of the "scheme" itself as the challenged transaction with shareholder approval necessary in the sense that the directors were elected to implement it. This court cannot accept the proposition that the order of magnitude of the directors' misdeeds justifies accepting the plaintiffs' "but for" theory of causation.[5] Under this theory all directors accused of continuing state law improprieties would be subject to a federal cause of action under section 14(a) for failure to disclose the improprieties in proxy statements because "but for" this failure they might not have been reelected to continue their course of misdeeds. Labeling a quantity of misdeeds a "scheme" does not magically transform what the plaintiffs are seeking damages for into a transaction requiring shareholder approval. For this reason defendants' motion to dismiss the Sixth Count must be granted.

B. *The Seventh Count—Rule 10b–5 Violations*

■ As noted earlier, the Seventh Count does no more than incorporate earlier paragraphs in the complaint, make reference to the four transactions described in Counts 2, 4 and 5, and attempt to state the elements of Rule 10b–5 as to all transactions. Defendants contend that while plaintiffs are free to challenge these transactions under state corporate law (or more properly Canadian law) as is done in the earlier counts, the contention that there is an alternative remedy under federal securities law is simply wrong. It is wrong because the Supreme Court in *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), laid down the rule that state corporate law was to control claims of corporate mismanagement unless the elements of a Rule 10b–5 cause of action are satisfied.

Although the more familiar case involving Rule 10b–5 is one in which the individual investor decides to buy or sell stock, the rule has been expanded to cover instances in which the shareholder is forced to sell or exchange his stock pursuant to corporate action, *see Santa Fe Industries,* as well as to instances in which the corporation itself engages in a securities transaction, *see Superintendent of Insurance v. Bankers Life and Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Claims in these two types of transactions are typically founded upon a breach of fiduciary duty by corporate management and/or controlling shareholders allegedly acting for their own interests.

In *Santa Fe Industries* minority shareholders brought suit in a federal district court seeking to set aside a merger and obtain the fair price for their stock. Under Delaware's "short-term" merger statute, however, a parent company owning at least 90% of the stock of a subsidiary may merge with a subsidiary upon approval of the parent company's board of directors. The minority shareholders must sell their shares back to the corporation at a price set by the

---

5. This is not to dispute plaintiffs' point that omissions in the proxy statements concerning the directors' misdeeds may well have been material to the stockholders' decision to keep electing them. This is not sufficient, however, to enable plaintiffs to obtain damages for transactions not requiring shareholder approval.

board of directors or seek court review of the price in an appraisal proceeding. Plaintiffs did not pursue their Delaware appraisal remedy; instead, they brought suit in federal court alleging that their stock had been unfairly priced in an effort to freeze out the minority shareholders in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 issued thereunder. The undisturbed finding of the district court was that there was no material misrepresentation or failure to disclose the terms of the transaction. 430 U.S. at 474, 97 S.Ct. at 1301.

In relation to the claim of fraud resting on the unfairness of the price forced on the minority shareholders, the court found that a breach of fiduciary duty by majority shareholders, without any allegation of deception did not violate the statute or the Rule. *Id.* at 476, 97 S.Ct. at 1302. This holding reversed a trend in Rule 10b–5 breach of fiduciary duty cases focusing on the unfairness of a transaction, rather than allegations of deception. *See Popkin v. Bishop,* 464 F.2d 714, 719 (2d Cir.1972); *Shell v. Hensley,* 430 F.2d 819, 825–27 (5th Cir.1970). *But see Santa Fe Industries,* 430 U.S. at 475 n. 15, 97 S.Ct. at 1301 n. 15. *See generally* Note, *Suits for Breach of Fiduciary Duty Under Rule 10b–5 After Santa Fe Industries, Inc. v. Green,* 91 Harv.L.Rev. 1874, 1879 (1978).

Although no notice was required under Delaware law, plaintiffs also claimed that the failure to give them advance notice of the merger constituted deception. The Supreme Court dismissed this claim on the ground that even if there was deception it could not have caused any injury since under Delaware law the minority shareholders were powerless to stop the transaction. This important holding was contained in a footnote that reads in part:

> [R]espondents do not indicate how they might have acted differently had they had prior notice of the merger. Indeed, they accept the conclusion of both courts below that under Delaware law they could not have enjoined the merger because an appraisal proceeding is their sole

remedy in the Delaware courts for any alleged unfairness in the terms of the merger. Thus, the failure to give advance notice was not a material nondisclosure within the meaning of the statute or the Rule. Cf. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438 [96 S.Ct. 2126, 48 L.Ed.2d 757] (1976).

430 U.S. at 474 n. 14, 97 S.Ct. at 1301 n. 14.

The Supreme Court in *Santa Fe Industries* did not set any standards for what constitutes deception, although that question presents a particularly difficult problem in derivative actions such as the present case. There is no doubt that such transactions can be reached under section 10(b) and Rule 10b–5. *Superintendent of Insurance v. Bankers Life and Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *Goldberg v. Meridor,* 567 F.2d 209 (2d Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978). The problem lies in defining the required element of deception. This issue was recently discussed at length by Judge Friendly in *Goldberg v. Meridor,* 567 F.2d at 215–17. Judge Friendly concluded that the Supreme Court in *Santa Fe Industries* had not meant to overturn case law in the Second Circuit, *see Schoenbaum v. Firstbrook,* 405 F.2d 215 (2d Cir.1968), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), and elsewhere that "there is deception of the corporation (in effect, of its minority shareholders) when the corporation is influenced by its controlling shareholder to engage in a transaction adverse to the corporation's interests . . . ." *Id.* at 217. What *Santa Fe Industries* added was that there must be nondisclosure or misleading disclosures as to the material facts of the transaction. *Id.* at 218.

In a derivative suit it must be the corporation that is considered to be deceived because the corporation is the purchaser or seller of stock. Since the acts complained of in derivative suits are accomplished through the board of directors, the shareholders temporarily become the repository of the corporation's capacity to be deceived. If misleading voluntary communications are

made to shareholders, deception is clearly present even in derivative suits.

A secondary and more difficult issue is presented when there is merely a failure to disclose information about self-dealing transactions to the shareholders, as was the case in these transactions.[6] I do not, however, have to reach that issue because the Third Amended Complaint fails to allege other facts essential to a cause of action under Rule 10b–5. As noted above, the Seventh Count does no more than make reference to four transactions and state the purported elements of a Rule 10b–5 action as to those transactions. In conclusion it alleges that "United Canso ... was rendered powerless to protect itself from the devices and plans of the defendants."

This is the full extent to which plaintiffs describe their situation as a result of defendants' alleged deception, *i.e.* the nondisclosures and possible misleading disclosures. There is no mention that there existed a contemporaneous injunctive remedy under Canadian law that a shareholder could have invoked to stop any of the four transactions.[7] Footnote 14 of *Santa Fe Industries,* quoted *supra* p. 239, established that the standard of "materiality" for an alleged deception of shareholders requires that they have a remedy under state law of which

they might have availed themselves had the defendants not practiced their deception.

The standard of materiality in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), referred to in footnote 14 as controlling in Rule 10b–5 cases, was a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." This standard, as the Supreme Court saw it in *Santa Fe Industries,* has as a threshold issue the question of whether the investor has a decision to make. Without any decision to make, the misleading information or lack of information loses any possible significance to the shareholder. Thus, in breach of fiduciary duty cases where shareholder approval is not called for, the question of materiality initially rests on the existence of a remedy under state law.

While it would perhaps be clearer to put the matter in terms of "causation" rather than "materiality," the existence of an injunctive remedy under Canadian law to stop the challenged transactions is an essential element of a 10b–5 cause of action for each transaction. Plaintiffs are required to

---

**6.** In addition to the proxy statement omissions, ¶ 105(c) of the Third Amended Complaint refers to untrue statements of material facts made in "other public filings, annual reports and statements." Without further specification, these allegations of affirmative misrepresentation cannot pass the test of Fed.R.Civ.P. 9(b) which governs Rule 10b–5 fraud cases as well as common law fraud cases.

In *Goldberg v. Meridor,* 567 F.2d 209 (2d Cir.1977) there were arguably affirmatively misleading press releases which failed to disclose some financial figures. The court stated in a footnote:

> We do not mean to suggest that § 10(b) or Rule 10b–5 requires insiders to characterize conflict of interest transactions with pejorative nouns or adjectives. However, if Maritimecor was in the parlous financial condition alleged in the opposing affidavit of plaintiff's counsel, a disclosure of the acquisition of Maritimecor that omitted these *facts* would be seriously misleading.

*Id.* at 218 n. 8.

**7.** In fact plaintiffs concede in their complaint that it would not have been in United Canso's best interest to stop the only securities transaction referred to in the Second Count. That transaction consisted of the sale by United Canso of all of its stock in United Canso U.K. to Deminex. United Canso U.K. was experiencing difficulty meeting its commitments to its partners in the North Sea Block exploration and would have forfeited its interests had the anticipated failure occurred. ¶ 39.

It was not until months after this sale that the agreement disposing of Catawba's royalty claims was reached. The plaintiffs complain of a payment pursuant to this agreement and rely on proxy statement omissions concerning this agreement to constitute a Rule 10b–5 violation. Thus, aside from the causation problem present in all of plaintiffs' Rule 10b–5 claims, it is apparent that the North and Celtic Sea transaction fails to state a cause of action under Rule 10b–5 because the alleged omissions were not made "in connection with" the purchase or sale of securities as required by the language of the Rule.

show that there existed state legal and equitable remedies to which they were deprived of access by defendants' deception.[8] The existence of the element of causation must be alleged. It is only thereafter that the question of whether the undisclosed or misleading information is material may be considered. This has not been done; therefore defendants' motion to dismiss the Seventh Count must be granted.

### III. *Borealis Claim re Damages*

Defendants seek to dismiss the Fifth Count (The Borealis Venture) of the Third Amended Complaint on the grounds that it fails to state a claim by failing to allege that the Borealis Venture has caused any monetary loss to United Canso. Defendants admit that the Third Amended Complaint contains allegations that Borealis defaulted on certain debentures held by United Canso and that United Canso along the way has relinquished certain working, stock and debt interests in the venture in exchange for the 9% net profits interest it now owns. Defendants assert that the failure to assert that this 9% interest is now worth less than the various interests relinquished along the way means that there is no claim that United Canso has been damaged, hence the claim is fatally flawed. However, the Fifth Count clearly alleges that United Canso was damaged by the breach of fiduciary and contractual obligations of its directors in connection with this venture. That is the crux of the claim presented in the Fifth Count. The motion to dismiss the Fifth Count of the Third Amended Complaint on the grounds that it fails to state a claim is denied.

### IV. *Fraud*

As noted earlier in the overview of the Third Amended Complaint, plaintiffs' fraud claims are incorporated in the same counts that contain the factual allegations of breach of fiduciary duty.[9] Defendants rightfully object to this conclusory labeling of fraud on top of factual allegations constituting a separate claim, *i.e.* breach of fiduciary duty. The traditional elements of common law fraud are nowhere clearly expressed. At the very least this constitutes failure to particularize the circumstances constituting the alleged fraud as required by Fed. Rule of Civil Procedure 9(b). To the extent that the acts relied upon by the plaintiffs as constituting fraud differ from those alleged to constitute a breach of fiduciary duty on the part of the defendants, the complaint is unnecessarily confusing and fails to put defendants on notice of the acts which allegedly constitute the fraud.

The remaining plaintiff has 30 days in which to allege with specificity factual allegations relied upon as constituting common law fraud without reference to any other count in the complaint. With a case this complicated it is imperative that separate causes of action be contained in separate counts.

### V. *The Individual Plaintiffs*

Over two years ago, on January 12, 1981, this court ordered the corporation realigned as plaintiff, declaring that the action was no longer a derivative one. Individual plaintiffs Saul Bluestone and Owen Messinger no longer have a derivative action because the corporation is now suing on its own behalf. It would seem that they have no standing. *See Vincel v. White Motor Corporation*, 521 F.2d 1113, 1118 (2d Cir. 1975). Indeed counsel for the individual plaintiffs has ceased in any practical sense to participate in this case. In addition, there is no doubt that the corporation has and will continue to fully pursue its claims in this court. Under these circumstances,

---

**8.** To the extent that the majority opinion in *Goldberg* appears to have relieved the plaintiff of pleading the availability of state relief, it can be distinguished from this case in that the defendant company in that action had its principal place of business in New York, the state in which the district court was also located. In its opinion the Court of Appeals quoted extensively from New York statutory and case law on the existence of an injunctive remedy. 567 F.2d at 219–20.

**9.** For example the only references to fraud in Counts Four and Five are ¶¶ 78 and 90 which describe actions specified in earlier paragraphs as a "continuing fraud."

the court has no hesitancy about dismissing the individual plaintiffs because of lack of standing and is confident that their disappearance will have no effect on this case except to simplify matters.

### Summary

For the reasons stated above, defendants' motions to dismiss are disposed of as follows. The motion to dismiss the Sixth and Seventh Counts, the federal securities law claims, for failure to state a claim is granted. The motion to dismiss the Fifth Count, concerning the Borealis Venture, for failure to state a claim under state law is denied. The motion to dismiss the individual plaintiffs from this case is also granted.

The remaining plaintiff, United Canso Oil & Gas Limited, has 30 days in which to allege with specificity the factual allegations relied upon as constituting common law fraud.